172 P.3d 512

**STATE of Hawai'i, Plaintiff–Appellee–Respondent,**

v.

**James George PLICHTA, Defendant–Appellant–Petitioner.**

**No. 27294.**

Supreme Court of Hawai'i.

Nov. 30, 2007.

As Corrected Dec. 6, 2007.

Karen T. Nakasone, Deputy Public Defender, for the defendant-appellant-petitioner James George Plichta, on the briefs and the application.

James M. Anderson, Deputy Prosecuting Attorney, for the plaintiff-appellee-respondent State of Hawai'i, on the briefs.

MOON, C.J., LEVINSON, and NAKAYAMA, JJ., and ACOBA, J., dissenting separately, with whom DUFFY, J., joins.

Opinion of the Court by LEVINSON, J.

We accepted the plaintiff-appellant-petitioner James George Plichta's application for a writ of certiorari in order to review the summary disposition order (SDO) of the Intermediate Court of Appeals (ICA) in *State v. Plichta*, 112 Hawai'i 471, 146 P.3d 631 (App. 2006). The ICA affirmed the judgment of the first circuit court, the Honorable Karl K. Sakamoto presiding, convicting Plichta of first degree unauthorized entry into a motor vehicle, in violation of Hawai'i Revised Statutes (HRS) § 708–836.5 (Supp.1996)[1] (Counts I & III), robbery in the first degree, in violation of HRS § 708–840(1)(b)(ii) (Supp. 1998)[2] (Count II), robbery in the second

---

1. HRS § 708–836.5 provided:

 (1) A person commits the offense of unauthorized entry into motor vehicle if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle with the intent to commit a crime against a person or against property rights.
 (2) Unauthorized entry into motor vehicle is a class C felony.

 Effective June 22, 2006, this statute was amended in respects immaterial to the present matter.

*See* 2006 Haw. Sess. L. Act 230, §§ 40 and 54 at 1019–20, 1025.

2. HRS § 708–840 provided in relevant part:

 (1) A person commits the offense of robbery in the first degree if, in the course of committing theft:
 . . . .
 (b) The person is armed with a dangerous instrument and:
 . . . .

degree, in violation of HRS § 708–841(1)(a) (1993) [3] (Count IV), unauthorized control of a propelled vehicle, in violation of HRS § 708–836 (1993 & Supp.2001) [4] (Count V), and first degree assault against a law enforcement officer, in violation of HRS § 707–712.5(1)(a) (2003 Supp.) [5] (Counts VII & VIII), all arising out of incidents occurring on August 1, 2003.

In his application, Plichta contends that the ICA gravely erred in concluding that the circuit court was correct in (1) permitting the plaintiff-appellee-respondent State of Hawai'i [hereinafter, "the prosecution"] to impeach his credibility at trial, notwithstanding HRS § 704–416 (1993),[6] by introducing evidence of statements that he did not make to any or all of the three court-appointed medical examiners regarding his purported beliefs concerning aliens, (2) giving limiting instructions to the jury to consider such evidence only for

impeachment purposes, and (3) denying his counsel's motion for a mistrial and to withdraw so that counsel could testify on Plichta's behalf to rehabilitate his credibility. *See* HRS § 602–59(b) (Supp.2006) (explaining that in deciding whether to grant an application, this court considers whether the ICA's decision reflects "(1) [g]rave errors of law or of fact[ ]" and whether "the magnitude of those errors ... dictat[es] the need for further appeal"). Plichta contends that the circuit court's alleged errors are not harmless beyond a reasonable doubt.

For the reasons discussed *infra* in section III, we conclude that HRS § 704–416 does not govern the admissibility of Plichta's non-statements to any or all of the examiners regarding his concerns about aliens. Consequently, the circuit court's admission of the non-statements into evidence and its limiting instruction to the jury to consider the evi-

---

(ii) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property.

Effective June 22, 2006, this statute was amended in respects immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 230, §§ 41 and 54 at 1020, 1025.

**3.** HRS § 708–841 provided in relevant part:

(1) A person commits the offense of robbery in the second degree if, in the course of committing theft:
(a) The person uses force against the person of anyone present with the intent to overcome that person's physical resistance or physical power of resistance....

Effective June 22, 2006, this statute was amended in respects immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 230, §§ 42 and 54 at 1020, 1025.

**4.** HRS § 708–836 provides in relevant part:

(1) A person commits the offense of unauthorized control of a propelled vehicle if the person intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.
(2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.
(3) It is an affirmative defense to a prosecution under this section that the defendant:
(a) Received authorization to use the vehicle from an agent of the owner where the agent

had actual or apparent authority to authorize such use; or
(b) Is a lien holder or legal owner of the propelled vehicle, or an authorized agent of the lien holder or legal owner, engaged in the lawful repossession of the propelled vehicle.
(4) For the purposes of this section, "owner" means the registered owner of the propelled vehicle or the unrecorded owner of the vehicle pending transfer of ownership; provided that if there is no registered owner of the propelled vehicle or unrecorded owner of the vehicle pending transfer of ownership, "owner" means the legal owner.

**5.** HRS § 707–712.5 provides in relevant part:

(1) A person commits the offense of assault against a law enforcement officer in the first degree if the person:
(a) Intentionally or knowingly causes bodily injury to a law enforcement officer who is engaged in the performance of duty....

**6.** HRS § 704–416, entitled "Statements for purposes of examination or treatment inadmissible except on issue of physical or mental condition," provides as follows:

A statement made by a person subjected to examination or treatment pursuant to this chapter for the purposes of such examination or treatment shall not be admissible in evidence against the person in any penal proceeding on any issue other than that of the person's physical or mental condition, but it shall be admissible upon that issue, whether or not it would otherwise be deemed a privileged communication, unless such statement constitutes an admission of guilt of the offense charged.

dence only for impeachment purposes were not erroneous. Furthermore, we conclude that the circuit court did not err in denying Plichta's counsel's motion to withdraw so that counsel could serve as a witness in an effort to rehabilitate Plichta's testimony. We therefore hold that the circuit court correctly denied Plichta's motion for a mistrial. Accordingly, the ICA committed no grave error in affirming the circuit court's April 12, 2005 judgment.

## I. BACKGROUND

### A. Factual Background And Charging

On the morning of August 1, 2003, Plichta was in front of a store in a strip mall on Sand Island Access Road, located in the City and County of Honolulu. People in the store heard car alarms outside, so a customer, Jonathan Jepson, left the store to check on his car, whereupon he was confronted by Plichta, who demanded his car keys. Jepson refused and returned to the store, where a store employee, Jason Reed, called the police. Plichta damaged the passenger side window of Jepson's car and proceeded down the strip mall striking a number other vehicles with a hatchet.

Reed walked toward Plichta, telling him to leave and that he had called the police. He observed that Plichta was very agitated and had long, wild hair, and dilated, bloodshot eyes. In Reed's view, Plichta appeared to be under the influence of an intoxicant. Plichta refused to leave, claiming that he would "liberate" himself and Reed. Consequently, Reed returned immediately to the store.

After a delivery van parked at the strip mall, Plichta pulled a handtruck out of the back of the vehicle's bay and threw it into the street. The driver of the van, Hilarion R. Sayson, Jr., exited the vehicle to investigate and, as he was approaching the back of the van, Plichta sprayed him in the face with pepper spray, causing him to fall to his knees. As Sayson began to stand up, Plichta sprayed him in the face a second time. When Plichta left momentarily, Reed, accom-

panied by firemen, carried Sayson to safety. Plichta returned and entered the van. At this point, officers from the Honolulu Police Department (HPD) began to arrive and Reed informed them that Plichta was in the van, prompting an officer to position his vehicle in front of the van. Plichta backed the van out of the parking stall and accelerated vigorously for approximately sixty to seventy feet into the police cruiser, knocking it back roughly fifteen feet. Plichta reversed the van several feet and again accelerated into the police cruiser. Ten seconds later, an additional four police cars arrived on the scene, and Plichta exited the van and attempted to escape on foot.

Plichta fled behind the store, pursued by four officers, and continued down the street. At one point, he turned around and sprayed two of the officers with pepper spray, one directly in the face. Nevertheless, the officers continued their pursuit of Plichta to a nearby store, when he again turned around to spray them, but, this time, as he was turning, he tripped and fell, and the officers detained him.

They handcuffed Plichta and informed him that he was under arrest, to which Plichta responded that he was the President of the United States, the chief of police, and part of an international agency and that the officers were "all in trouble." In response to the officers' questions about his name, address, social security number, and birth date, Plichta said that he had been smoking ice a few hours before. At this point, Plichta was twitching repeatedly and attempting to wiggle out of the handcuffs.

On August 7, 2003, Plichta was charged with the seven counts set forth supra, in addition to a count of first degree criminal property damage, in violation of HRS § 708–820(1)(a) (Supp.2003) [7] (Count VI).

### B. The Medical Examinations Of Drs. Stojanovich, Gitter, and Wade

Shortly after his arrest on August 1, 2003, Plichta told his counsel that, in the events

7. HRS § 708–820 provided in relevant part:

(1) A person commits the offense of criminal property damage in the first degree if:
 (a) The person intentionally or knowingly damages property and thereby recklessly

places another person in danger of death or bodily injury....
See also 2003 Haw. Sess. L. Act 19, § 1 at 27–28 (explaining that the amended law took effect on April 16, 2003). Effective May 22, 2006 and July 1, 2007, this statute was amended in respects

leading up to his arrest, he believed that he was being pursued by aliens. On August 29, 2003, Plichta disclosed his intention to rely on the legal theory of lack of penal responsibility by filing a motion for appointment of examiners to determine his fitness to proceed and penal responsibility, as provided by HRS § 704–404 (1993 & Supp.1997).[8] On September 19, 2003, the circuit court entered an order appointing Drs. Kosta Stojanovich, Olaf Gitter, and Terence Wade as examiners to determine Plichta's fitness to proceed and penal responsibility. *See supra* note 8.

Dr. Stojanovich interviewed Plichta on October 24, 2003, and filed his report to the circuit court on October 30, 2003. He opined that, as a result of an acute psychotic breakdown, Plichta, at the time of the events giving rise to the present matter, much more likely than not suffered from (1) an impairment of his cognitive capacity such that he could not substantially appreciate the wrongfulness of his alleged conduct and (2) an impairment of his volitional capacity such that he could not conform his behavior to the standards required by law. While the report suggested that Plichta believed that there were "many people who were 'after' him for several months," and that he had an "enemy who had been after him for many previous months," the report did not indicate that Plichta had mentioned his beliefs concerning aliens to Dr. Stojanovich.

Dr. Gitter interviewed Plichta on October 27, 2003 and filed his report to the circuit court on October 30, 2003. He opined that

Plichta's cognitive and volitional capacities at the time of the alleged offenses were substantially impaired as a result of a methamphetamine-induced psychotic disorder, but not depression. The report indicated that "Plichta denied experiencing auditory, visual, olfactory and tactile hallucinations, as well as ideas of reference and mind reading," what Dr. Gitter "termed psychotic target symptoms." Plichta did talk "about being followed by various people who ha[d] been causing difficulties for him in the past," but the report was silent as to any mention of aliens by Plichta.

Dr. Wade interviewed Plichta on October 29, 2003 and filed his report on November 3, 2003. He opined that Plichta's prior methamphetamine use impaired his capacities to conform his conduct to the requirements of law and to appreciate the wrongfulness of his conduct at the time of the events leading to his arrest. The report indicated that Plichta's "conversation had a pervasive theme of people and the world being against him," but, again, the report did not discuss any beliefs pertaining to aliens.

Although it is not reflected in the record, the circuit court apparently transmitted copies of the three examiners' reports to the prosecution and, more importantly, to Plichta's counsel, as required by HRS § 704–404, *see supra* note 8.

#### C. *Trial*

##### 1. *Plichta's opening statement*

Plichta's trial commenced on January 10, 2005. In her opening statement, Plichta's counsel began by telling the jury that:

immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 116, §§ 5 and 10 at 332–33; 2007 Haw. Sess. L. Act 98, §§ 1 and 6 at 170–71.

8. HRS § 704–404, entitled "Examination of defendant with respect to physical or mental disease, disorder, or defect," provided in relevant part:
(1) Whenever the defendant has filed a notice of intention to rely on the defense of physical or mental disease, disorder, or defect excluding responsibility, or there is reason to doubt the defendant's fitness to proceed, or reason to believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case, the court may immediately suspend all further proceedings in the prosecution....

(2) Upon suspension of further proceedings in the prosecution, the court shall appoint three qualified examiners in felony cases ... to examine and report upon the physical and mental condition of the defendant....

. . . .

(6) The report of the examination, including any supporting documents, shall be filed in triplicate with the clerk of the court, who shall cause copies to be delivered to the prosecuting attorney and to counsel for the defendant.

Effective June 22, 2006, this statute was amended in respects immaterial to the present matter. *See* 2006 Haw. Sess. L. Act 230, §§ 6 and 54 at 999–1000, 1025.

[On] August 1, 2003 James Plichta set out to walk his dog. A short while later he was running for his life. He was running from a group, as he thought, of people. They weren't people. They weren't human. They were attackers. They were aliens. They were beings that were surrounding him.

At this point, the prosecution objected on the ground that, "[u]nless defense anticipates defendant testifying to any of this, I don't believe the doctor's going to be allowed to testify to aliens." Defense counsel responded that "the doctor can testify to this," apparently referring to Dr. Stojanovich, and that Plichta "intends to testify to this also." The prosecution replied, "Very well[,]" and the circuit court overruled the objection.

Defense counsel then continued her opening statement as follows:

James Plichta found himself surrounded by an array of nonhuman, alien attackers who were after him to destroy him. He was in that area at that time because he believed that by going there to Sand Island he would be given the information he needed to escape, that he was going to be rescued by other human beings who knew about these attackers, that he would be rescued from that area.

And he entered Mr. Jepson's car not believing it was Mr. Jepson's car but believing it was a vehicle that he was entitled and supposed to enter to find the way to how he was to be rescued, that when Mr. Jepson came after him, [Mr. Jepson] was just one more attacker, one more alien out to kill him, out to cause him to be destroyed.

And as things progressed—and, yes, you'll hear these things did happen that the [prosecution] has described in terms of the conduct . . . that took place. As these things continued to happen, [Plichta] runs to the United Foods van. He starts looking in . . . the back of the truck, to try to find out[, "]What am I supposed to be doing here? Where is the answer to this escape?["]

And he finds nothing, but then he's got Mr. Sayson and all these angry people at him. Then he's got the police coming toward him. And as it culminates and as it builds, he's more and more threatened. He's more and more out of control. He's more and more panicked.

All of this episode is described by one of the witnesses. You'll hear Dr. [K]osta Stojanovic[h]. He is a medical examiner who examined Mr. Plichta after this offense[and] who analyzed the information in this case. . . . And he'll testify as to what he found.

And what he'll tell you is that James Plichta, on August 1, 2003, more likely than not suffered from a mental disease, defect, or disorder that basically prevented him from knowing right from wrong, from being able to recognize the wrongfulness of his conduct. In other words, he didn't know that these were the very things he was doing. He didn't have a sense the way you and I would of what we were seeing obviously happening.

And Dr. Stojanovic[h] will also tell you that [Plichta] . . . suffered from an impairment of his volitional capacity, meaning he couldn't control his conduct. He couldn't make himself behave in accordance with the law at that point because of his mental illness. Dr. Stojanovic[h] will tell you this is a brief psychotic episode. And a psychosis is a severe mental illness at the time a person loses contact with reality. There's a lot of definitions, but he'll explain that to you.

. . . And Dr. Stojanovic[h] will explain to you that underlying illness that [Plichta] had that developed into this psychosis and that he still has although he's over the psychosis[.] Dr. Stojanovic[h] will explain to you how that mental condition turned into the psychosis that led to the results on this day.

. . . .

The issue is[,] was he able to control his conduct? Was he aware of the wrongfulness of his conduct? And Dr. Stojanovic[h] is going to tell you that he was not. And when you finish hearing that evidence as well as the evidence of the conduct that occurred, we're going to ask you to return a verdict of not guilty . . . "by reason of insanity," "lacking penal responsibility."

Not meaning he's not responsible. Meaning he's not penally or criminally responsible because of his mental situation at that time.

2. *The prosecution's case-in-chief and the bench conference regarding Plichta's statements to the examiners*

■ In its case-in-chief, the prosecution relied on the testimony of, *inter alios:* (1) persons who were present at the store when Plichta damaged a number of the cars parked outside of the store; (2) Sayson, who Plichta attacked with pepper spray; (3) HPD officers, who arrested Plichta; and (4) HPD evidence specialists, who investigated the scene after Plichta's arrest. The prosecution did not call any of the examiners because Plichta's claim of lack of penal responsibility is an affirmative defense for which he had the burden of proof, *see State v. Uyesugi,* 100 Hawai'i 442, 456, 60 P.3d 843, 857 (2002).

After the prosecution rested, the circuit court conferred with the parties regarding the prosecution's prospective questioning of the medical examiners concerning Plichta's statements to them, and the court asked the prosecution about the types of statements it intended to explore. The prosecution responded, "I do not believe that [Plichta] gave the same version of the facts that I heard during opening statement to these doctors." The prosecution explained that:

If [the examiners are] informed that [Plichta] may have made statements to others or in court that differ from the statements he made to them, that may have an impact on their opinion as to whether or not he malingered when he spoke to them originally.... I don't really know what the defense is going to put forward but ... they made an opening statement that caught me by surprise.

The court responded:

I'm going to have to wait to hear what testimony arises. It may be that I give a cautionary instruction and limit the use of any statements that are being used. You're using it for impeachment to challenge the credibility. I may limit it just to that and it cannot be used as an admission

to establish guilt, or something of that nature....

3. *Dr. Stojanovich's testimony*

The defense first called Dr. Stojanovich, who testified that the only time he saw Plichta was when he interviewed him on October 24, 2003. Consistent with his report, *see supra* section I.B, Dr. Stojanovich opined that, at the time of Plichta's alleged offenses, "much more likely than not he was suffering with impairments in his thinking and his general behavior." When questioned extensively by defense counsel on direct examination about the basis for Plichta's conduct on the day in question, Dr. Stojanovich discussed Plichta's financial condition, unemployment, delusions, childhood, depression, use of methamphetamine, and beliefs that people were against him. Dr. Stojanovich did not, however, testify regarding Plichta's beliefs in aliens, and defense counsel did not specifically ask him about the subject. The prosecution did not inquire into the aliens issue on cross-examination.

On redirect examination, defense counsel addressed the effect of Plichta's delusions on his cognitive capacity, but did not ask whether one such possible effect was a delusional belief in aliens. On recross-examination, the prosecution asked, in the abstract, whether methamphetamine can cause delusions:

Q. Would ... methamphetamine at times cause delusions?

A. The methamphetamine commonly causes hallucinations and not delusions.

Q. Hallucinations, hallucinations like aliens?

A. Like aliens, mm-hmm....

On redirect examination, defense counsel continued the discussion regarding the relationship between hallucinations and methamphetamine but did not ask whether Plichta told the doctor whether he had seen aliens or otherwise had delusions pertaining to aliens. In fact, in the course of Dr. Stojonavich's lengthy testimony, defense counsel did not once raise the issue of Plichta's beliefs in aliens.

#### 4. *Plichta's direct testimony*

Plichta took the stand following Dr. Stojanovich's testimony. He testified that, in the 1990s, he "read on subjects known as theosophy, theology-philosophy, [and] alternative earth theories," because he was interested in "UFO phenomena, ... spiritual studies, philosophy[,] ... religion, ... [and] anything that explained our history or where mankind came from." By 2002, his worldview had changed because he had "researched things about the future, like doomsday theories, how the earth was going to end, [and] where humanity was going." He read "extensively on some conspiracy theories that there were secret societies that were planning [to get him] all along ... and that their plans were gradually coming to fruition." According to the books Plichta read, these secret societies were comprised of "people that really weren't of Earth," but were "humanoid" in form. Plichta believed that these humanoids intended to destroy democracy and peace and instead create a "socialist police state." Plichta testified that these beliefs in aliens motivated his actions on the day in question.

#### 5. *Plichta's testimony on cross-examination*

On cross-examination, the prosecution attempted to query Plichta about the questions the examiners had posed to him concerning his thoughts, when defense counsel objected on the basis that Plichta's statements to the examiners were inadmissible. The prosecution advised the circuit court that it intended to ask Plichta whether he told the examiners about his beliefs in aliens to which he previously testified, because the prosecution believed that Plichta had not in fact told anyone about those beliefs. In response, Plichta's counsel represented that he had shared his fear of aliens with her shortly after his arrest. The circuit court informed the prosecution that, if it was crafting its questions in order to impeach Plichta, then the court would give a limiting instruction that the jury should only consider Plichta's responses in weighing and assessing his credibility. Plichta's counsel asserted that, if the prosecution were permitted to impeach Plichta's testimony on the basis of his omissions, then

counsel would have to become a witness to testify that, prior to the medical examinations, Plichta had informed her of his thoughts about aliens. The circuit court decided to allow the line of questioning by the prosecution for the limited purpose of impeachment and instructed the jury accordingly.

Resuming its cross-examination, the prosecution elicited the following testimony from Plichta:

Q. ... Mr. Plichta, isn't it true that you did not tell Doctor Wade anything about your views that there were aliens amongst us?

A. I can't completely recall what I told Doctor Wade.

Q. Isn't it true you never told that to Doctor Gitter?

A. I don't think I even used the term "aliens."

Q. Isn't it true you never expressed your obsessions in reading about these philosophies and religions dealing with individuals out to get you?

A. They never gave me a chance.

. . . .

Q. Now, [alternative earth history] was something that was prevalent [in your mind] ... leading up to August 1st, 2003, is that correct ... ?

A. Yes.

Q. Okay. And this was very important as far as [what] you believed then; correct?

A. Yes.

. . . .

Q. ... Is it correct that you believed that there were ... humanoids or people who took the form of humans, that were not of this world that were living amongst us?

A. That I currently believe that?

Q. That you believed at the time of ... August 1st, 2003?

A. Yes, ... I believe I said that.

Q. Okay. And that was something that was pervasive, something very strong in your thought process; is that correct?

A. Yes.

Q. And in fact there were good people who were out trying to help you and save you and there were bad people out to get you; is that correct?

A. Yes.

Q. And these were the thoughts that were going through your mind on August 1st, 2003?

A. On that date and there had been times before.

. . . .

Q. You knew [that] . . . one of the primary reasons you were [being interviewed] was to express to the doctors anything relating to your mental condition such that it might reach a level that would remove your criminal responsibility in this case; is that correct?

A. Yes.

Q. And the prevailing thoughts on your mind as to what was going on in the time period around August 1st 2003 were these statements or positions or theories that you've expressed to the jury today; correct?

A. Yes. I'm quite certain I mentioned all of that to Stojanovich as well as Wade. Doctor Gitter didn't give me the opportunity to bring any of the subjects up nor did he ask about them.

Q. So in terms of Doctor Wade, you're pretty sure you mentioned this to him?

A. Yes, I am.

The next day, the circuit court conferred with counsel, explaining its interpretation of HRS § 704–416:

When we left off yesterday, we were discussing some of [HRS § ]704–416 and the limits to that section. . . . [U]pon further reflection and reading that statute, it prohibits examinations about facts and circum-

stances that were revealed . . . by the defendant pursuant to the examination.

The scope of [the prosecution's] examination is aimed at what he didn't say, not what he said, and I think that's a distinction. And because of that I'm going to leave my ruling as it stands so long as [the prosecution] does not bring out facts and circumstances as they pertain to what was said. I'm going to allow it.

### 6. *The motions for a mistrial and to withdraw and Plichta's testimony on redirect*

Plichta's counsel moved for a mistrial and to withdraw so that she could testify on Plichta's behalf that his testimony regarding his beliefs in aliens was not a recent fabrication, but was instead consistent with statements that he had previously made to her shortly after he was arrested. Counsel asserted that Plichta was "denied a chance to present his defense and the credibility of his defense and [that] his statements are being attacked with no counterattack and no ability to prove that it's not the first time he's said these things." Counsel further argued that, at minimum, she should be allowed to ask Plichta, "[W]hen did you first tell [someone] about [your concerns regarding aliens] and who did you tell[?]" According to counsel, Plichta's prior consistent statements would be admissible under Hawai'i Rules of Evidence (HRE) Rule 613.[9]

The prosecution argued that Plichta's counsel could not make herself a witness because her motion was untimely and she should have confirmed with Plichta or the examiners whether Plichta had told the examiners about his beliefs in aliens. With respect to Plichta's counsel's request to question Plichta regarding his prior consistent statements to her, the prosecution asserted that:

(2) An express or implied charge has been made that the witness' testimony at the trial is recently fabricated or is influenced by bias or other improper motive, and the consistent statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen. . . .

---

9. HRE Rule 613 provides in relevant part:

(c) Prior consistent statement of witness. Evidence of a statement previously made by a witness that is consistent with the witness' testimony at the trial is admissible to support the witness' credibility only if it is offered after:

. . . .

[I]f the Court rules that [Plichta's counsel is] permitted to ask [Plichta] what he told counsel, ... that should be where it ends. And counsel can't consider it and can't say anything more [than] what [Plichta] said.... But ... if the Court rules she can ask him[and] he can say I told you, [counsel], then that's where inquiry should end[,] at that point.

Agreeing with the prosecution, the circuit court denied both the motion for a mistrial and the motion to withdraw. With respect to the motion to withdraw, the circuit court stated to defense counsel that she would "be allowed to ask [Plichta] if he made prior consistent statements and I agree with [the prosecution] that you can't be a witness in this trial."

Based on the circuit court's ruling, Plichta's counsel elicited the following testimony from Plichta:

Q. Now, you were asked by [the prosecution] ... why you didn't tell the doctor the things that you told the jury. Have you ever previously told anyone those things?

A. Yes.

Q. And who was that?

A. I told you.

Q. All right.... I have no further questions. Thank you.

(Formatting altered.)

### 7. *Dr. Gitter's testimony regarding Plichta's omissions*

Following Plichta's testimony, the prosecution called Dr. Gitter as a rebuttal witness. On direct examination, Dr. Gitter testified that he explained to Plichta that the purpose of the interview was to determine his penal responsibility for the circuit court. He also testified that he believed that Plichta gave a complete explanation of the factors affecting him on the day of his alleged conduct:

Q. ... Did you allow Mr. Plichta to provide you a complete answer as to what may or may not have been affecting him on or about August 1 of 2003?

A. I think so. I mean, I don't remember the details; this is a year-and-a-half ago that I interviewed him at [the O'ahu Community Correctional Center] for 65 minutes. Having done these evaluations so many times I know what information I need and sometimes I do guide the defendants through to get the kinds of information I need.

Q. But if an individual is attempting to tell you what thoughts were going through [his or her] head at or about the time frame that you need to evaluate that person for purposes of penal responsibility, is it your practice to cut them off?

A. Typically not, no.

In addition, the prosecution elicited the following testimony from Dr. Gitter with respect to Plichta's concerns regarding aliens:

Q. Now, during the course of your interview of Mr. Plichta, did he ever speak about ... humanoids or ... other beings who came in human form who were amongst us?

A. No.

Q. Did he ever express any strong interest in literature discussing those types of topics?

A. Not that I'm aware of.

Q. He never discussed it with you?

A. No, sir.

Q. If Mr. Plichta had been involved in that kind of thinking along the lines of these other beings in humanoid form who were going to take over the world and perhaps place him in danger, would you have expected that some information regarding that would have been provided to you during your interview of Mr. Plichta?

A. I suppose so, but that wasn't provided to me.

On cross-examination, defense counsel attempted to explore why Dr. Gitter did not have a record of Plichta's beliefs in aliens:

Q. Now, when you saw Mr. Plichta, you went in with certain things you needed to know, correct, from your experience and training?

A. Yes.

Q. And if he started rambling about something that was not apparently help-

ful to you, would not your job require that you—

A. I might redirect him.

Q. Redirect him so that you could get to what you needed to get to?

A. I would redirect him except, again, if he had rambled or talked about some of those things, I would have made a note of that in my own mind, my own notes that he expressed some kind of delusional belief. And the only delusions he mentioned to me was the persecutory kind of feelings that people were persecuting, that they were following him around.

Q. And in fact it never went deep enough for you to ask him whether those people might be alien or human-appearing but not really human?

A. I never asked him that question, no.

. . . .

Q. . . . [D]id you in fact preserve or did you tape record the conversation with [Plichta]?

A. No, I did not.

Q. You simply take notes?

A. I take notes.

Q. So if . . . he did in fact tell you something that was rambling but perhaps you didn't pick up on as significant, there's no way of knowing that now?

A. There's no objective evidence in terms of a tape recording. But I do know during the mental status examination he was not rambling, he was very clear, . . . coherent[and exhibited] goal-directed speech [and] tight associations. And I also mentioned that in my report under the mental status examination he denied all psychotic target symptoms.

Q. And what are psychotic target symptoms?

A. I typically always ask the defendants if they have any auditory hallucinations, visual hallucinations, . . . olfactory hallucinations, [or] tactile hallucinations. I'll ask them . . . whether they have paranoid ideas whether other folks are following, and that's where I got it that he said that he felt like people are following him.

I asked him whether he has any ideas of reference, meaning does he ever feel that people are talking about him behind his back, or does he feel that when he watches TV or listens to the radio that he gets some secret message from the media. I also ask them routinely whether he feels that people can literally read his mind on the spot or whether he can do it, and he denied all those things.

Q. But he didn't deny the idea about people following him?

A. That's what he said[,] that he thought that people had been following him.

Q. And how much did you expand upon that with him?

A. I don't recall.

On redirect examination, the prosecution asked Dr. Gitter about Plichta's delusions:

Q. Now, you've already testified regarding the delusions the defendant may have expressed to you, specifically the persecution delusions that he may have had at the time that you spoke with him. At any point did, other than those persecution delusions, did Mr. Plichta indicate or suggest any other delusions that . . . were affecting him on or about the time of . . . the summer of 2003?

A. No.

Q. [Plichta] didn't express any kind of doomsday theories to you?

A. No, he did not.

. . . .

Q. . . . [Plichta] never mentioned anything about aliens, for instance?

A. Not to me.

Q. And he never mentioned anything about some philosophy along the lines of the aliens in human form taking over the world?

A. He did not mention it to me nor did I see it mentioned to anybody in the jail.

On recross-examination, defense counsel resumed her efforts to explore why Dr. Gitter did not have prior knowledge of Plichta's fear of aliens:

Q. Do you have any information whether you or anyone who examined [Plichta]

has ever sat down and just said tell us what happened and what you were feeling and given him the floor for a length of time?

A. No.

### 8. *Dr. Wade's testimony regarding Plichta's omissions.*

After Dr. Gitter testified, the prosecution called Dr. Wade, who testified that Plichta had not shared with him his beliefs in aliens:

Q. ... [A]t any point during the course of your interview with [Plichta] or from any of the records that you were able to review, did Mr. Plichta talk about anything regarding the end of the world?

A. No.

Q. Did he talk about [the fact that] there might be, or suggest that there were, aliens in humanoid form that intended to take over the world?

A. No.

Q. Did he express anything along the lines of those kinds of statements to you?

A. No.

Q. Did he express to you that he was involved in reading about these types of things, including other-Earth histories, perhaps conspiracy theories, anything along those lines?

A. No.

Q. ... [I]f those were prevailing thoughts on ... the part of Mr. Plichta at the time of your interview with him, would you have expected those types of things to come forward?

A. Yes.

Q. Can you explain why?

A. Well, when I asked him about what the purpose was of my interview, he talked about having consulted with his attorney about his mental state at the time of the offense and whether he would have a defense to his mental state.

Q. ... [D]id he at any point indicate any thing that would remotely suggest that

he had thoughts about the world being ... ended or that there were aliens amongst us?

A. No.

On cross-examination, Dr. Wade testified that his interview of Plichta had lasted approximately one hour in duration. Much like her questioning of Dr. Gitter, defense counsel attempted to demonstrate why Dr. Wade's report did not include any references to Plichta's thoughts about aliens:

Q. ... As far as the interview you had with [Plichta], did you tape record that?

A. No.

Q. So you don't have any verbatim record to go back and look now [at] what he told you?

A. I wrote down a lot of things that he told me.

Q. But no verbatim record?

A. I would say those were verbatim.

Q. You don't have the complete interview recorded in any manner that we could go back and look at now; correct?

A. The entire interview, no.

### 9. *Verdict and sentencing*

On January 26, 2005, the jury found Plichta guilty as charged as to all counts, save Count VI.[10] On April 12, 2005, the circuit court sentenced Plichta to a prison term of five years as to Counts I, III, V, VII, and VIII, twenty years as to Count II, and ten years as to Count IV, all terms to run concurrently. The circuit court entered its judgment on April 12, 2005.

### D. *Appellate Proceedings*

Plichta filed a notice of appeal on May 12, 2005. In his opening brief, Plichta argued that the circuit court erred by admitting his non-statements with respect to aliens in violation of HRS § 704–416, *see supra* note 6, and by instructing the jury that it might consider such evidence for credibility purposes. Plichta further argued that the circuit court abused its discretion in denying

---

**10.** On April 26, 2005, the circuit court granted the prosecution's motion for *nolle prosequi* without prejudice as to Count VI.

defense counsel's motion for a mistrial and to withdraw so that, in a new trial, she could rehabilitate Plichta's credibility by testifying that he had made prior statements to her regarding his belief in aliens before he was interviewed by the examiners. Finally, Plichta asserted that the circuit court's alleged errors were not harmless beyond a reasonable doubt and that he was, therefore, entitled to a new trial.

In its answering brief, the prosecution countered that HRS § 704–416 did not address the admissibility of statements that Plichta did *not* make to the examiners and, therefore, did not bar the admissibility of any non-statements. The prosecution argued that, because Plichta's failure to mention aliens to the examiners did not demonstrate his guilt but was pertinent to show his mental condition on the day in question, HRS § 704–416 did not bar admission of Plichta's non-statements. Lastly, the prosecution asserted that the circuit court did not abuse its discretion by denying defense counsel's motions for a mistrial and to withdraw, because she had an adequate opportunity to rehabilitate Plichta's credibility by asking him whether he had made prior consistent statements regarding his beliefs in aliens.

The ICA agreed with the prosecution, concluding that HRS § 704–416 does "not preclude the [prosecution's] cross-examination of Plichta regarding statements pertaining to his beliefs in humanoids or aliens made by Plichta during his direct examination" and, therefore, affirmed the circuit court's April 12, 2005 judgment. ICA's SDO at 2. The ICA entered its judgment on appeal on December 19, 2006.

Plichta filed his timely application for a writ of certiorari on March 19, 2007, and we accepted the application on April 23, 2007.

## II. STANDARDS OF REVIEW

### A. Statutory Interpretation

A "cardinal" canon of statutory construction is that this court "cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts." *State v. Dudoit*, 90 Hawai'i 262, 271, 978

P.2d 700, 709 (1999) (quoting *State v. Buch*, 83 Hawai'i 308, 326, 926 P.2d 599, 617 (1996) (Levinson, J., concurring and dissenting) (quoting *State v. Meyer*, 61 Haw. 74, 78, 595 P.2d 288, 291 (1979))). This is because "[w]e do not legislate or make laws." *Dudoit*, 90 Hawai'i at 271, 978 P.2d at 709 (citations omitted).... *[S]ee also id.* at 270 n. 8, 978 P.2d at 708 n. 8 ("[A]s Justice Ramil himself [has] aptly observed, as author of this court's opinion in *State v. Richie*, 88 Hawai'i 19, 30, 960 P.2d 1227, 1230 (1998), '[i]t is a cardinal rule of statutory interpretation that, where the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning.'" (Citations omitted.) (Some brackets added and some in original.)).

*State v. Smith*, 103 Hawai'i 228, 233, 81 P.3d 408, 413 (2003) (quoting *State v. Mueller*, 102 Hawai'i 391, 394, 76 P.3d 943, 946 (2003) (quoting *State v. Yamada*, 99 Hawai'i 542, 552–53, 57 P.3d 467, 477–78 ... (2002) (some brackets added and some in original))).

*State v. Haugen*, 104 Hawai'i 71, 75, 85 P.3d 178, 182 (2004) (some ellipsis added and some in original).

At the same time,

"the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *State v. Griffin*, 83 Hawai'i 105, 108 n. 4, 924 P.2d 1211, 1214 n. 4 (1996) (quoting *State v. Malufau*, 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citations and internal quotation marks omitted)) (brackets and internal quotation marks omitted). *See also* HRS § 1–15(3) (1993) ("Every construction which leads to an absurdity shall be rejected.").

[*Gray v. Administrative Director of the Court*, 84 Hawai'i 138,] 148, 931 P.2d [580,] 590 [ (1997).]

*State v. Cornelio*, 84 Hawai'i 476, 484, 935 P.2d 1021, 1029 (1997) ... (some brackets added and some in original). Accordingly, this court has departed from literal interpretations of "plain, obvious, and unambiguous" statutes under the following conditions:

> "[T]his court is ... willing to look beyond the plain, obvious, and unambiguous language of a statute, the facial constitutionality of which is not at issue, for the purpose of ascertaining its underlying legislative intent, but only if a literal construction 'would produce an absurd and unjust result.'" ... *Buch,* 83 Hawai'i [at] 326–27, 926 P.2d [at] 617–18 ... (Levinson, J., concurring and dissenting) (citing *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu,* 70 Haw. 361, 773 P.2d 250 (1989), and *Franks v. City and County of Honolulu,* 74 Haw. 328, 843 P.2d 668 (1993)) ... (footnote omitted). *Dudoit,* 90 Hawai'i at 270, 978 P.2d at 708....

*Haugen,* 104 Hawai'i at 76–77, 85 P.3d at 183–84 (emphasis omitted).

### B. *Motion For A Mistrial*

 The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. *State v. Loa,* 83 Hawai'i 335, 349, 926 P.2d 1258, 1272 ... (1996) (citations omitted). " 'The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.'" *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (quoting *State v. Furutani,* 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994)). *State v. Rogan,* 91 Hawai'i 405, 411, 984 P.2d 1231, 1237 (1999).

### C. *Motion To Withdraw As Counsel*

 A motion to withdraw as counsel is subject to the "approval of the court," Hawai'i Rules of Penal Procedure Rule 57, and the court's decision is reviewed for abuse of discretion. *See State v. Ahlo,* 2 Haw.App. 462, 469, 634 P.2d 421, 426–27 (1981) ("In this case, the proposed change came at the end of the prosecution's case and toward the end of a long trial. We see no abuse of discretion in the court's refusing to allow the withdrawal [of defense] counsel....").

### III. *DISCUSSION*

### A. *The Circuit Court Correctly Admitted Evidence Of Plictha's Omissions To The Medical Examiners.*

#### 1. *HRS § 704–416 does not govern the admissibility of Plichta's non-statements to the examiners.*

##### a. *The plain language of the statute does not address the admissibility of non-statements.*

HRS § 704–416, entitled "*Statements* for purposes of examination or treatment inadmissible except on issue of physical or mental condition," provides that:

> A *statement* made by a person subjected to examination or treatment pursuant to this chapter for the purposes of such examination or treatment shall not be admissible in evidence against the person in any penal proceeding on any issue other than that of the person's physical or mental condition, but it shall be admissible upon that issue, whether or not it would otherwise be deemed a privileged communication, unless such *statement* constitutes an admission of guilt of the offense charged.

(Emphases added.) The circuit court was correct in concluding that the statute only serves to exclude the defendant's statements, because the plain language does not mention, much less exclude, the defendant's "non-statements," "non-assertive omissions," or "conduct." *Cf. State v. Kelekolio,* 74 Haw. 479, 521, 849 P.2d 58, 77 (1993) (determining that evidence of a sexual assault complainant's fantasies were not barred by HRE Rule 412, because the rule was "specifically designed to protect alleged sexual assault victims from being impeached by evidence of past sexual *conduct,* as distinguished from past sexual *cognition*" (emphasis in original)).

A "statement" is "[a] verbal assertion or nonverbal conduct intended as an assertion." *Black's Law Dictionary* 1444 (8th ed.2004); *see also State v. Kalani*, 108 Hawai'i 279, 284, 118 P.3d 1222, 1227 (2005) ("This court 'may confirm the ordinary meaning of statutory terms by resort to extrinsic aids, such as dictionaries and our case law.' " (Quoting *Williamson v. Hawai'i Paroling Auth.*, 97 Hawai'i 183, 197, 35 P.3d 210, 224 (2001).)); HRE Rule 801 (defining "statement" under the rules of hearsay as "an oral assertion, an assertion in a writing, or nonverbal conduct of a person, if it is intended by the person as an assertion"). In the present matter, Plichta testified that he did not tell at least one of the three examiners about his views "that there were aliens among us" and that he did not disclose to any of the examiners his "obsession[ ] in reading about [alien] philosophies and religions dealing with individuals out to get [him]." Drs. Gitter and Wade confirmed that Plichta did not disclose to them his concerns regarding aliens. By the plain meaning of the term, Plichta's non-assertive omissions are not "statements" for purposes of HRS § 704–416.

The dissent does not appear to dispute that Plichta's omissions are not statements. *See* Dissenting opinion at 224, 172 P.3d at 536 n. 4, at 230, 172 P.3d at 542 n. 13. Instead, it asserts that "[b]y its plain language[,] HRS § 704–416 limits admissibility to 'statement[s] made by a person[,]' not statements that were not made by a person." *Id.* at 224, 172 P.3d at 536 (some brackets added and some in original). We interpret this point as arguing that the statute governs both statements and non-statements but limits admissibility to statements and that, therefore, non-statements are inadmissible under the rule. There is, however, no language in the section that "limits" admissibility to statements alone; the statute does not say that "only" or "nothing except" a statement made by a person may be admissible.

Moreover, the dissent's reading is out of step with the conventional manner in which rules of evidence are construed. For example, HRE Rule 802 provides that "[h]earsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawai['i] supreme court, or by statute." Were the dissent's analytical approach applied to HRE Rule 802, non-hearsay would, by implication, be *per se* inadmissible, insofar as the rule only speaks to hearsay and does not address the admissibility of non-hearsay. If the rule is to make any sense, it must be read to exclude only subjects that lie wholly within its scope and for which language within the rule provides for exclusion. HRS § 704–416 should not be stretched beyond its terms to exclude non-statements and, accordingly, we disagree with the dissent's analysis of the statute's plain language.[11]

Nor do we agree with Plichta. At oral argument, Plichta argued that the statute should be read to bring non-statements within its purview, on the reasoning that when a defendant's non-assertive omission to an examiner is introduced at trial, the omission is employed to demonstrate that the defendant's statements, by implication, did not include the omission. In other words, Plichta suggests that a defendant's statements as a whole are being used against him whenever a non-statement is introduced. This idea has, indeed, been recognized in another context: this court has concluded that, when a trial court admits a prior statement to show inconsistency by omission, the relevant portion of the prior statement may be admitted to demonstrate the absence of the statement in question. *See Asato v. Furtado*, 52 Haw. 284, 287–89, 474 P.2d 288, 292–93 (1970) (concluding that the transcript of the defendant's past testimony at a criminal proceeding for careless driving should have been admitted to impeach his testimony in a civil trial by showing that the defendant previously omitted an important fact at the prior proceeding relating to causation). Yet, unlike the intro-

11. The balance of the dissent's analysis of HRS § 704–416 appears to rest on the premise that the statute does not completely exclude non-statements, given that the dissent proceeds to discuss whether non-statements are admissible under the statute for impeachment purposes. *See* dissenting opinion at 6–24. Because we conclude at the outset that HRS § 704–416 does not in any way govern the admissibility of Plichta's non-assertive omissions, we do not address this portion of the dissent's opinion.

duction of a prior inconsistent statement, the admission of a non-statement in the present matter does not import with it the defendant's actual statements into evidence as well. By its plain language, HRS § 704-416 only comes into play when the prosecution attempts to introduce the defendant's "statement [itself] . . . in evidence against the person," *see supra* note 6.

In sum, the words of HRS § 704-416 are susceptible to but one interpretation: they speak to statements but are silent as to non-statements. *See Haugen*, 104 Hawai'i at 75, 85 P.3d at 182 (2004) ("[W]here the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning." (Quoting *Smith*, 103 Hawai'i at 233, 81 P.3d at 413)).

### b. *The plain language of HRS § 704-416 does not lead to an absurd result.*

Moving past what HRS § 704-416 says, Plichta next argues about what he thinks it means. As Plichta observes, this court has occasionally departed from a literal interpretation of a statute when such a reading would lead to an absurd result in light of otherwise demonstrable legislative intent. *See id.* at 77, 85 P.3d at 184 ("The legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality."). Relying on the commentary to the statute, Plichta asserts that the statute's purposes of protecting the defendant's privilege against self-incrimination [12] and ensuring that the defendant feels confident in the examinations would be undermined if the statute is read as not governing the admissibility of non-statements.

According to the commentary, the statute's flat prohibition against any statement that "constitutes an admission of guilt of the offense charged," *see supra* note 6, was intended to safeguard the defendant's privilege against self-incrimination. *See* Commentary to HRS § 704-416. The defendant's privilege against self-incrimination is not jeopardized if non-assertive omissions are viewed as being beyond the scope of the statute, because admission of the defendant's omissions, as demonstrated *supra*, does not automatically portend admission of any of his actual statements, much less any statement that could be characterized as a self-incriminating admission of guilt expressly barred by HRS § 704-416, *see supra* note 6.

The statute does not permit the admission of statements "on any other issue other than that of the person's physical or mental condition," *see supra* note 6, "'to safeguard the defendant's rights and to make possible the feeling of confidence essential for effective psychiatric [and other medical] diagnosis or treatment.'" Commentary to HRS § 704-416 (quoting Model Penal Code, Tentative Draft No. 4, comments at 201 (1955)) (brackets in original). Placing non-statements outside the purview of the statute does not significantly undermine a defendant's confidence that what he does say will, by and large, be kept out of court. It would, however, likely serve to encourage the defendant to be more forthcoming with the examiners, which is consistent with HRS ch. 704's general objective of aiding examiners in gaining access to information relating to the defendant's mental and physical condition at the time of the offense in question. *Cf.* Supplemental Commentary to HRS § 704-404 (1993) (explaining that HRS § 704-404(8) was amended "to allow the examiners access to police and juvenile records, including those expunged," because "[t]he legislature found that the accuracy and objectivity of sanity examinations would be enhanced if the examiners . . . were provided with a wider range of information"); *see Haugen*, 104 Hawai'i at 76, 85 P.3d at 183 ("'[W]e must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.'" (Quoting *Cornelio*, 84 Hawai'i at 484, 935 P.2d at 1029.)). HRS ch. 704 was principally designed to relieve

---

12. The defendant's right against self-incrimination is "guaranteed by the fifth and fourteenth amendments to the United States Constitution and article I, section 10 of the Hawai'i Constitution." *State v. Naititi*, 104 Hawai'i 224, 237, 87 P.3d 893, 906 (2004). Both provisions declare that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.; Haw. Const. art. I, § 10.

criminally irresponsible defendants of penal liability, *see* HRS § 704–402(1) (1993) ("Physical or mental disease, disorder, or defect excluding responsibility is an affirmative defense."), and excluding non-statements from the purview of HRS § 704–416 furthers that end. In short, the statute's purposes are not imperiled by interpreting its terms in a straightforward fashion.

■ Because the plain language of HRS § 704–416 does not address non-statements, *see supra* section III.A.1.a, and because an ordinary reading of the statute does not produce an absurd result, we hold that the statute does not govern non-statements. *See Haugen*, 104 Hawai'i at 75, 85 P.3d at 182 (observing that because this court does "'not legislate or make laws,'" it "'cannot change the language of the statute, supply a want, or enlarge upon it in order to make it suit a certain state of facts'" (quoting *Dudoit*, 90 Hawai'i at 271, 978 P.2d at 709)).

2. *The circuit court did not plainly err in permitting the prosecution to cross-examine Plichta regarding his non-statements to the examiners.*

Although Plichta did not object in the circuit court and did not raise the issue as plain error on appeal, the dissent concludes that the circuit court plainly erred by abusing its discretion in allowing the prosecution to inquire into what Plichta did not say, because it feels that the inquiry exceeded the scope of proper cross-examination under the standards this court set forth in *State v. Pokini*, 57 Haw. 17, 548 P.2d 1397 (1976). *See* dissenting opinion at 231, 172 P.3d at 543. In *Pokini*, this court concluded that, when a criminal defendant testifies, his credibility may be impeached if the inquiry has "some rational bearing upon the defendant's capacity for truth and veracity," 57 Haw. at 22, 548 P.2d at 1400, but that "where the testimony is of minimal value on the issue of credibility and comes into direct conflict with the defendant's right to a fair trial, the right of cross-examination into those areas must yield," *id.*

at 23, 548 P.2d at 1401. The *Pokini* rule is implicit in HRE Rule 403, pursuant to which a trial court may preclude cross-examination if the probative value of the impeachment evidence is substantially outweighed by the danger of unfair prejudice to the defendant's right to a fair trial.[13] *See State v. Culkin*, 97 Hawai'i 206, 221, 35 P.3d 233, 248 (2001) (holding that the circuit court erred in permitting the prosecution to cross-examine the defendant regarding allegedly false identification cards, because the court had advanced notice that the defendant intended to invoke his privilege against self-incrimination).

a. *Plichta's failure to mention his thoughts about aliens to the examiners is fairly probative of whether he was truthful when he testified later that he had those thoughts.*

■ The dissent contends that the probative value of the defendant's non-statements is minimal, citing *State v. McCrory*, 104 Hawai'i 203, 87 P.3d 275 (2004). Dissenting opinion at 233–34, 172 P.3d at 545–46. In *McCrory*, the prosecution introduced the testimony of the defendant's cellmate that the defendant "never proclaimed his innocence while incarcerated prior to trial." 104 Hawai'i at 205, 87 P.3d at 277. This court held that the defendant's non-statement was irrelevant under HRE Rule 401, because the fact that the defendant did not tell his cellmate that he was innocent did not make it more or less probable that he committed the crime. *Id.* at 206, 87 P.3d at 278. This court further reasoned that the defendant had no duty to speak to his cellmate and that there were many possible reasons why the defendant may have maintained his silence. *Id.* at 206–07, 87 P.3d at 278–79.

In this case, by contrast, Plichta did not disclose to the examiners some of his thoughts or beliefs he later claimed to have held on the day of the incident concerning aliens, thoughts which, he asserted, affected his mental condition, and were at the core of

---

**13.** HRE Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

his affirmative defense that he was relieved him of penal responsibility. He understood that the purpose of the interviews was to evaluate his mental condition. The trier of fact could therefore find that his failure to mention those beliefs in the examinations made it more probable that he was not actually driven by those beliefs on the day in question. *See United States v. Cordova,* 421 F.2d 471, 474 (9th Cir.1970) (concluding that inconsistencies by omission in the defendant's exculpatory statements to law enforcement were relevant to "the false or misleading character of [the defendant's] exculpatory statements at trial," because such evidence went to "the validity of [the defendant's] explanation of his conduct on the day of his arrest").

While Plichta had no statutory duty to speak to the examiners about his beliefs in aliens in the examinations, as Drs. Gitter and Wade opined, it is fair to expect that he would have at least mentioned those beliefs, insofar as he knew the purpose of the examination, and the beliefs were clearly material to his mental condition and critical to his defense of lack of penal responsibility. It is also fair to expect that Plichta would have spoken to Dr. Gitter in particular about his aliens issues, because Dr. Gitter specifically assessed Plichta's psychotic target symptoms, which entailed asking Plichta whether he had harbored ideas that people were following him and/or reading his mind. *See Asato,* 52 Haw. at 292, 474 P.2d at 297 (concluding that the plaintiffs, who sued the defendant for injuries they sustained in an automobile accident, should have been allowed to impeach the defendant's credibility by showing a prior inconsistent statement through his failure to mention at a prior proceeding that he had heard a loud noise before he crashed his car into the plaintiff's automobile, because the defendant had been questioned at the prior proceeding about the crash more than once, the defendant purported to give a full and complete account, and the crash was an important and material fact).

■ We are aware that Plichta attributes his omissions to the examiners' control of the flow of the interviews and to his claim that

some of the examiners cut short some of his statements. Plichta's argument, however, is relevant to the *weight* to be accorded the evidence of the omissions and not to its *admissibility;* it was for the jury to decide whether it believed Plichta's explanation.

Accordingly, we conclude that Plichta's failure to mention his concerns regarding aliens, was clearly relevant to the question whether he was being truthful when he testified at trial that he had those concerns at the time of the incident.

 b. *The probative value of Plichta's non-statements is not substantially outweighed by the danger of unfair prejudice to his right to a fair trial.*

■ The dissent next contends that the prosecution's use of Plichta's non-statements conflicts with his right to a fair trial, as that right is embodied by the procedures set forth in HRS ch. 704. Dissenting opinion at 233–34, 172 P.3d at 545–46. The dissent implies that the procedures prescribed by HRS ch. 704 precluded the examiners from testifying regarding Plichta's failure to describe some of his beliefs in aliens because HRS ch. 704 only permits testimony elicited to aid the jury in understanding how the examiners reached their conclusions respecting Plichta's mental condition and that any omission, by its nature, could not serve such a purpose. *See id.*

The procedures set forth in HRS ch. 704 do not, however, preclude examiners from testifying with respect to what a defendant did not say during the interviews. Indeed, as set forth *supra* in section III.A.1.a, HRS § 704–416—the specific section dealing with evidentiary matters—only addresses the admissibility of the defendant's statements; it does not govern, and hence cannot foreclose, his non-statements. Therefore, insofar as the introduction of Plichta's non-statements did not violate HRS ch. 704's provisions, Plichta's right to a fair trial, as embodied by these provisions, was not prejudiced by the admission of the testimony.

In short, the circuit court was correct in ruling that HRS § 704–416 did not govern the admissibility of Plichta's non-assertive

omissions, *see supra* section III.A.1, and the circuit did not plainly err in permitting the prosecution's inquiry into those omissions under *Pokini.* Consequently, the ICA correctly concluded that the circuit court did not err in receiving evidence of Plictha's non-statements.[14]

### B. *The Circuit Court Did Not Abuse Its Discretion In Denying Plichta's Counsel's Motions To Withdraw And For A Mistrial.*

Plichta contends that the circuit court abused its discretion in denying his motion for mistrial because the circuit court disregarded applicable law by (1) admitting his non-statements, (2) instructing the jury to limit its consideration of those non-statements to the matter of impeachment, and (3) denying his attorney's motion to withdraw as counsel so that she could testify in rehabilitation of Plichta's credibility. For the reasons we have articulated *supra* in section III.A, we conclude that the circuit court's admission of the non-statements and instructions to the jury were correct, and, therefore, that the circuit court did not abuse its discretion in denying the motion for mistrial on these grounds. Thus, the issue is narrowed to whether the circuit court erred in denying Plichta's counsel's motion to withdraw.

■ Plichta argues that the circuit court should have granted his counsel's motion to withdraw, citing *Chuck v. St. Paul Fire & Marine Insurance Co.,* 61 Haw. 552, 606 P.2d 1320 (1980). In *Chuck,* this court considered whether a lawyer who is privy to certain disputed material facts about which he is competent to testify should be disqualified as counsel. *Id.* at 559, 606 P.2d at 1325. We concluded that disqualification should be based on " 'consideration of all pertinent factors including, *inter alia,* the significance of the matters to which [the lawyer] might testify, the weight his testimony might have in resolving such matters, and the availability of

other witnesses or documentary evidence by which these matters may be independently established.' " *Id.* at 560, 606 P.2d at 1325 (quoting *Comden v. Superior Court of Los Angeles County,* 20 Cal.3d 906, 145 Cal.Rptr. 9, 576 P.2d 971, 974 (1978)). These same considerations should inform a trial court's exercise of its discretion in addressing an attorney's motion to withdraw. *See Utah v. Leonard,* 707 P.2d 650, 654 (Utah 1985) ("When counsel makes a *timely* and good faith application to withdraw because of the need to preserve important evidence and not just to obtain some tactical advantage, a motion to withdraw should be granted." (Emphasis added.)).

■ We emphasize that a trial court should consider whether the motion to withdraw is timely, insofar as counsel should move to withdraw from the case as soon as counsel should reasonably foresee that his or her testimony on a material matter will likely be required. *See Connecticut v. Blake,* 157 Conn. 99, 249 A.2d 232, 234 (1968) ("The proper course . . . would be for the attorney to withdraw from the case as soon as it became reasonably foreseeable that his testimony on a material matter might be likely to be required.").

### 1. *Dr. Stojanovich's testimony provided a reasonable alternative means of establishing Plichta's prior statements regarding his beliefs in aliens.*

The credibility of Plichta's testimony regarding his mental condition was key to his insanity defense; indeed, he testified in order to establish his lack of penal responsibility. During opening statements, once Plichta's counsel began to discuss Plichta's alien theories, the prosecution objected, questioning whether Plichta or Dr. Stojanovich could testify regarding aliens, insofar as the prosecution, to that point, was apparently unaware of those theories. Defense counsel expressly

---

14. Plichta contends that the circuit court's limiting instructions to the jury pertaining to his non-assertive omissions to the examiners were plainly erroneous under HRS § 704–416, because, as stated previously, Plichta believes that the statute should have barred the admission of the non-statements for impeachment purposes.

Inasmuch as we conclude that the circuit court did not err in admitting Plichta's non-statements, *see supra* section III.A, the circuit court's instructions to the jury to consider Plichta's non-statements for purposes of credibility were not erroneous, and the ICA did not gravely err in declining to conclude to the contrary.

represented to the circuit court and the prosecution that Plichta would himself be addressing the subject and that "the doctor can testify to this," apparently referring to Dr. Stojanovich. Accordingly, if defense counsel's representation was accurate, Dr. Stojanovich could have established that Plichta had spoken with him about aliens before he was interviewed by Drs. Gitter and Wade, without the need for defense counsel testifying herself, obviating the need for her to withdraw and justifying the circuit court's denial of her motion. *See Missouri v. Mason*, 862 S.W.2d 519, 521–22 (Mo.Ct.App. 1993) (concluding that the trial court did not err in refusing to allow the defendant's counsel to withdraw to impeach a witness's testimony, because the attorney failed to show that he was in the unique position of being the only witness available who could testify on the matter).

Furthermore, defense counsel had the opportunity and the incentive to elicit this testimony from Dr. Stojanovich. After the prosecution rested, at a bench conference, it informed the circuit court and defense counsel that, in light of counsel's opening statement that Plichta would testify to alien theories, it intended to use the content of Plichta's statements to the examiners to undermine Plichta's testimony. The circuit court aptly characterized the prosecution's strategy as employing Plichta's omissions "for impeachment to challenge [his] credibility." Thus, Plichta's counsel should have known that the prosecution intended to attack Plichta's credibility based on his omissions. Plichta offers no explanation as to why his counsel did not inquire into the aliens issue during her examination of Dr. Stojanovich, in order to soften the impending blow to Plichta's credibility.

### 2. *Defense counsel's motion to withdraw was untimely.*

Plichta's counsel asserted that Plichta disclosed his beliefs concerning aliens to her shortly after he was arrested on August 1, 2003. The examiners submitted their reports near the end of October 2003. While the reports were replete with Plichta's theories that he was being pursued by certain

people, the reports did not mention that Plichta believed those people to be aliens. Plichta's counsel appears to have received copies of the reports, as required by HRS § 704–404, *see supra* note 8, and, thus, was on notice that Plichta did not mention his beliefs regarding aliens to the examiners. Alternatively, Plichta's counsel could have learned of Plichta's omissions simply by asking her client or the examiners about the interviews.

 Before the January 2005 trial, counsel should have known whether Plichta would likely testify and, at that juncture, should have foreseen that, if Plichta testified regarding his beliefs in aliens in support of his irresponsibility defense—his sole defense at trial—then the prosecution would surely attempt to impeach his credibility by showing that he had not disclosed those beliefs to the examiners. *Cf.* Hawai'i Rules of Professional Conduct (HRPC) Rule 3.7 cmt. 4 (explaining that the rule, which governs the circumstance in which the lawyer is likely to be a necessary witness, is often applied in the situation where "the lawyer [is a necessary] impeaching witness, that is, as the means by which another witness' prior inconsistent statement is to be proved" and that, in such a situation, "the need for such impeachment should be foreseen not only in preparation for trial but even in advance of the initial witness interview that produced the impeaching material"). Consequently, if, for whatever reason, counsel believed that Dr. Stojanovich's testimony would not be sufficient and that her testimony would be necessary to establish the affirmative defense of insanity, for which Plichta had the burden of proof, *see Uyesugi*, 100 Hawai'i at 456, 60 P.3d at 857, then counsel should have withdrawn *before* trial. *See Blake*, 249 A.2d at 234.

Indeed, HRPC Rule 3.7 required that Plichta's counsel withdraw before trial if she believed that her testimony was necessary. The rule, entitled "Lawyer as Witness," provides in relevant part:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
>
> (1) the testimony relates to a uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

In this case, Plichta's counsel's potential testimony related to a contested issue, *i.e.,* Plichta's credibility. Moreover, her testimony did not relate to the nature and value of the legal services rendered in this case and her withdrawal would not have worked a substantial hardship on Plichta, because another attorney from the public defender's office could have represented Plichta at trial, insofar as HRPC 3.7(b) provides that "[a] lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9." Neither HRPC Rule 1.7 [15] nor HRPC Rule 1.9 [16] would have been implicated here, because those rules govern conflicts of interest and the record does not reflect that there would have been any such conflict if another attorney from the public defender's office had represented Plichta at trial. Thus, none of the exceptions to HRPC Rule 3.7 apply here.

Having reviewed the three medical examiners' reports before the commencement of trial, if defense counsel thought that her testimony regarding Plichta's early statements to her regarding his bizarre ideation was necessary to the optimization of Plichta's affirmative defense of lack of penal responsibility, much less the prior consistency of those statements, then she was ethically bound by HRPC Rule 3.7 not to serve as Plichta's trial counsel in the first place. Counsel apparently made a judgment call that her testimony was not necessary because she appeared at trial and represented to the circuit court and the prosecution during her opening statement that Plichta and Dr. Stojanovich would lay the factual founda-

tion for the irresponsibility defense, including Plichta's beliefs in aliens. Notwithstanding that representation, counsel did not elicit such testimony from Dr. Stojanovich, but instead moved to withdraw after the prosecution had impeached Plichta's testimony, and the case was only one day away from closing arguments.

Counsel's near-end-of-trial motion to withdraw simply came too late. *See Ahlo,* 2 Haw.App. at 469, 634 P.2d at 426–27, *supra* section II.C; *North Carolina v. Brady,* 16 N.C.App. 555, 192 S.E.2d 640, 641–42 (1972) (holding that the trial court did not abuse its discretion in refusing to allow the defendant's attorney to testify at trial to contradict a police officer's testimony—which differed from his testimony at a preliminary hearing—because if the attorney "wished to testify as a witness he should have withdrawn as counsel prior to the trial"); *Helmick v. Virginia,* 38 Va.App. 558, 567 S.E.2d 551, 555 (2002) (concluding that the trial court did not abuse its discretion in denying defense counsel's motion to withdraw to testify for the defendant on an issue of bias, in part because the motion was not timely insofar as "counsel was aware of the potential 'bias' issue before trial and delayed addressing it until mid-trial").

Under the circumstances, we conclude that Plichta has not shown that the circuit court clearly exceeded the bounds of reason by denying the motion to withdraw. *See State v. Kido,* 109 Hawai'i 458, 461, 128 P.3d 340, 343 (2006) (" 'The burden of establishing abuse of discretion is on appellant and a strong showing is required to establish it. An abuse of discretion occurs only if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.' " (Quoting *State v. Nguyen,* 81 Hawai'i 279, 286, 916 P.2d 689, 696 (1996).)). Inasmuch as the circuit court did

---

**15.** HRPC Rule 1.7, entitled "Conflict of Interest: General Rule," provides that, subject to certain exceptions, a lawyer shall not represent a client if the representation of that client (a) "will be directly adverse to another client" or (b) "may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests."

**16.** HRPC Rule 1.9, entitled "Conflict of Interest: Former Client," governs certain instances of a lawyer's conduct that may be adverse to his former client's interests.

not abuse its discretion in denying the motion to withdraw, the circuit court likewise did not abuse its discretion in denying the motion for mistrial. Accordingly, we hold that the ICA did not gravely err by concluding that the circuit did not err in this matter.

### III. *CONCLUSION*

For the foregoing reasons, we affirm the December 19, 2006 judgment of the ICA.

Dissenting Opinion by ACOBA, J., with whom DUFFY, J., Joins.

I respectfully dissent.

In my view, Hawai'i Revised Statutes (HRS) chapter 704, when read as a whole, and its underlying policies, excludes evidence of what Petitioner/Defendant–Appellant James George Plichta (Petitioner) purportedly did *not* relate to court appointed examiners for the purpose of impeaching him at trial. The admission of such evidence was prejudicial error. Accordingly, I would reverse the December 19, 2006 judgment of the Intermediate Court of Appeals (ICA), vacate the April 12, 2005 judgment of conviction of the circuit court of the first circuit (the court), and remand the case for a new trial.

### I.

HRS chapter 704 establishes a process by which a defendant can establish an affirmative defense to charged conduct by proving that a physical or mental disease, disorder, or defect substantially incapacitated him from knowing right from wrong or from conforming his conduct to the requirements of law. The statutory provisions, as discussed *infra*, provide for examinations by professionals to determine the defendant's condition, the submission of examiners' reports to the court, and the admission of testimony by the examiners, all with respect to the defendant's physical or mental condition at the

time of the charged conduct. The provisions for examination and treatment are not only for the benefit of the criminally mentally ill defendant, but for society as a whole. *See State v. Castro*, 93 Hawai'i 454, 463, 5 P.3d 444, 453 (App.2000) (Acoba, J., concurring) ("In the most egregious of circumstances, a mentally ill defendant who otherwise should have been subjected to examination and treatment may remain untreated in prison and upon his or her release, present a further or greater risk to public safety.") (internal citations omitted).

### II.

In his application, Petitioner raised the following dispositive questions.[1]

Whether the ICA gravely erred in (1) upholding [the] attack [by Respondent/Plaintiff–Appellee State of Hawai'i (Respondent)] on [Petitioner's] credibility at trial with prior statements [Petitioner] had made to the three-panel of examiners, under HRS § 704–416 [(1993)]; [2] (2) upholding the [court's] limiting instruction to the jury, to consider [Petitioner's] prior statements to the three-panel, for credibility purposes only[.]

In a brief SDO the ICA stated that "we conclude that HRS § 704–416 did not preclude [Respondent's] cross-examination of [Petitioner] regarding statements pertaining to his beliefs in humanoids or aliens made by [Petitioner] during his direct examination. *State v. Samuel*, 74 Haw. 141, 150–51, 838 P.2d 1374, 1379 (1992)." SDO at 2.

### III.

In regard to the first and second question, cross-examination into what was *not* told to the examiners necessarily implicates the examination process itself. Under that process, the three member panel examination may be convened when "the defendant has

---

1. The third question was "[w]hether the ICA gravely erred in ... affirming the [court's] denial of the defense's motion for mistrial to allow defense counsel to withdraw, so that counsel could testify on [Petitioner's] behalf to rehabilitate [Petitioner's] credibility." Under the analysis herein the third question need not be discussed.

2. *See* text, *infra*, for provisions of HRS § 704–416 entitled "Statements for purposes of examination or treatment inadmissible except on issue of physical or mental condition."

filed a notice of intention to rely on the defense ... or there is a reason to ... believe that the physical or mental disease, disorder, or defect of the defendant will or has become an issue in the case[.]" HRS § 704–404(1) (1993). HRS § 704–404(2) (Supp.2003) provides that "the court shall appoint three qualified examiners in felony cases ... to examine and report upon the physical and mental condition of the defendant."

Although not expressly stated, it is apparent that a defendant cannot avoid such an examination. HRS § 704–404(2) (1993 & Supp.2003) (the court "may order the defendant to be committed to a hospital or other suitable facility for the purpose of the examination"). Accordingly, "[i]f the examination cannot be conducted by reason of the unwillingness of the defendant to participate therein, the report shall so state[.]" HRS § 704–404(5) (1993).

The examiners are charged with rendering "[a]n opinion as to ... the capacity of the defendant to appreciate the wrongfulness of the defendant's conduct or to conform the defendant's conduct to the requirements of law ... at the time of the conduct alleged[.]" HRS § 704–404(4)(d) (1993 & Supp.2003). An examiner's report must also include "(a) [a] description of the nature of the examination [and] (b) [a] diagnosis of the physical or mental condition of the defendant[.]" HRS § 704–404(4)(a) and (b) (1993 & Supp.2003).

The court must make "available for inspection by the examiners" "all existing, medical, social, police and juvenile records, including those expunged, and other pertinent records in the custody of public agencies[.]" HRS § 704–404(8) (1993). The examiners may employ "any method ... which is accepted by the profession[ ] of medicine[.]" HRS § 704–404(3) (Supp.2003). Each examiner's "diagnosis and opinion" must have been "arrived at independently of any other examiner[.]" HRS § 704–404(4)(f) (Supp.2003). "The report of the examination, including any supporting documents, shall be filed ... with the clerk of the court, who shall cause copies to be delivered to the prosecuting attorney and to counsel for the defendant." HRS § 704–404(6) (1993).

At trial, "[e]vidence that the defendant suffered from a physical or mental disease, disorder, or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is required to establish an element of the offense." HRS § 704–401 (1993). In that respect, "the examiners ... may be called as witnesses by the prosecution, the defendant, or the court." HRS § 704–410(1) (1993). Further,

[w]hen an examiner testifies on the issue of the defendant's responsibility for conduct alleged[,] ... the examiner shall be permitted to make a statement as to the nature of the examiner's examination, the examiner's diagnosis of the physical or mental condition of the defendant at the time of the conduct alleged, and the examiner's opinion of the extent, if any, to which the capacity of the defendant ... was impaired as a result of physical or mental disease, disorder, or defect at that time.

HRS § 704–410(3) (1993).

Also, "[w]hen an examiner testifies, the examiner shall be permitted ... to clarify the examiner's diagnosis and opinion and may be cross-examined as to any matter bearing on the examiner's competency or credibility or the validity of the examiner's diagnosis or opinion." HRS § 704–410(4) (1993). However, "[a] statement made by a person subjected to examination ... shall not be admissible in evidence ... on any issue other than that of the person's physical or mental condition, but it shall be admissible upon that issue, ... unless such statement constitutes an admission of guilt[.]" HRS § 704–416 (1993).

### IV.

As to the first question, HRS § 704–416 states in its entirety that:

A statement made by a person subjected to examination or treatment pursuant to this chapter for the purposes of such examination or treatment *shall not be admissible in evidence against the person in any penal proceeding on any issue other than that of the person's physical or mental condition,* but it shall be admissible upon

that issue, whether or not it would otherwise be deemed a privileged communication, *unless such statement constitutes an admission of guilt* of the offense charged. (Emphases added.) According to the Commentary on HRS § 704–416, this section was intended to "to safeguard the defendant's rights and to make possible the feeling of confidence essential for effective psychiatric [and other medical] diagnosis or treatment," and, as such, "the defendant's statements made for this purpose may not be put in evidence on any other issue, e.g., whether the defendant in fact engaged in the proscribed conduct, in penal proceedings."[3] Commentary on HRS § 704–416 (internal quotation marks and footnote omitted) (brackets in original).

### A.

By its plain language HRS § 704–416 limits admissibility to "statement[s] made by a person[,]" not statements that were not made by a person.[4] However, HRS § 704–416 is the only provision in chapter 704 that refers to the substance of the examination. The provisions of the chapter are silent with respect to the specific situation posed here: whether an examinee may be impeached for what was not said in the examination. Hence, while HRS § 704–416 specifically prohibits admissions of guilt made during an

examination from being used at trial, its silence as to unmade statements does not invariably sanction admission of the failure to make a particular statement into evidence for impeachment purposes.

In the framework of HRS chapter 704, no provision permits impeachment of the defendant by way of a failure to make a statement to an examiner in the examination process. *Cf. State v. Domingo*, 69 Haw. 68, 70, 733 P.2d 690, 692 (1987) (defendant's statements made in three-member panel examination cannot be used to impeach him). Because HRS § 704–416 fails to expressly cover this question, the statutory scheme of HRS chapter 704 and its underlying policies must be considered. *See Paul v. Dep't of Trans.*, 115 Hawai'i at 416, 426, 168 P.3d 546, 556 (2007) (quoting *Gray v. Admin. Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (footnote omitted)) (recognizing that "we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose") (internal quotation marks omitted); *Narmore v. Kawafuchi*, 112 Hawai'i 69, 88, 143 P.3d 1271, 1290 (2006) (quoting HRS § 1–16 (1993)) ("Laws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other.") (internal quotation marks omitted).[5]

---

**3.** The Model Penal Code is to the same effect:

> This section embodies the view that the important expert knowledge of the mental condition of a defendant, acquired by examination or treatment on order of the court, should be fully available in evidence in any proceeding where his mental condition may properly be in issue; but to safeguard the defendant's rights and to make possible the feeling of confidence essential for effective psychiatric diagnosis or treatment, the defendant's statements made for this purpose may not be put in evidence on any other issue.

Comment to MPC § 4.09 at 266 (1985).

**4.** The majority also notes that HRS § 704–416 explicitly mentions only "statements" and then goes to analyze whether Petitioner's failure to mention "aliens" to the examiners constitutes a "statement." Majority opinion at 214, 172 P.3d at 526. With all due respect, this analysis is inapt. First, neither the parties nor this dissent posit that not mentioning aliens would somehow constitute a "statement" for purposes of HRS § 704–416.

Second, the majority's importation of the definition of "statement" from the Hawai'i Rules of Evidence (HRE) Rule 801, majority opinion at 215, 172 P.3d at 527, is inappropriate because (1) completely different policies underlie the admissibility of hearsay and statements made during HRS § 704–404 physical and mental examinations, (2) HRE Rule 802 is inapposite because this case does not present a situation where the out-of-court *silence* is being admitted for the truth of the matter being asserted therein, and (3) the hearsay analogy is inappropriate because Petitioner's lack of mention of "aliens" was not in response to any specific question posed by the examiners.

**5.** The majority takes issue with the conclusion that language of HRS § 704–416 limits admissibility to statements made by a person undergoing an evaluation pursuant HRS § 704–404 because HRS § 704–416 does not explicitly state that "'only or 'nothing except' a statement may be admissible." Majority opinion at 215, 172 P.3d at 527. However, as discussed *infra*, the majority's position conflicts within an in pari materia

### B.

This is to be compared with a similar statute permitting impeachment. The Supreme Court of Colorado in *People v. Pearson*, 190 Colo. 313, 546 P.2d 1259 (1976) (en banc), reviewed a statute authorizing impeachment despite the limited use otherwise allowed of a defendant's communications during court-ordered examinations.[6] It concluded that although evidence acquired from communications by a defendant during the course of a court-ordered mental examination was admissible for limited purposes only, the statute could not be interpreted as only permitting statements concerning a defendant's lack of capacity to form a specific intent, because the express language of the statute indicated "statements concerning other issues of his guilt" might be used to impeach or rebut when the defendant testified in his own behalf. *Pearson*, 546 P.2d at 1266.

Contrastingly, in the instant case, no express allowance of impeachment is contained in HRS § 704–416. Under HRS chapter 704, the only matter concerning the examinations explicitly permitted at trial are statements as to the physical and mental condition of the defendant (excluding statements of guilt). In that regard, it appears that permitting impeachment of a defendant by way of what was *not* said in an examination would undermine the express purposes for which an examination is held, as recounted hereafter.[7]

### V.

If the examination, compelled as it is under the statute, were treated as a circumstance permitting impeachment of a defendant because of what he failed to say, the statutory procedures would no longer "make possible the feeling of confidence essential for effective psychiatric and other medical diagnosis or treatment." Commentary on HRS § 704–416 (quoting MPC Tentative Draft No. 4, comments at 201 (1955) (brackets omitted)). The examination itself would necessarily become a forum for presenting a legal defense in anticipation of the type of cross-examination allowed in the instant case.

For permitting Respondent to question Petitioner as to what was *not* told to the examiners opens up a universe of possible inquiries that Petitioner would have had to prepare for and to speculate upon *prior* to

---

reading of HRS § 704–416 and other provisions of the chapter.

**6.** The statute at issue in *Pearson*, Colo. Sess. Laws 1972, ch. 44, 39–8–107(1) at 228, "provides that any statements made by the defendant are admissible for limited purposes at the trial on defendant's guilt" and states as follows:

Except as provided in this subsection (1), *no evidence acquired directly or indirectly for the first time from a communication derived from the defendant's mental processes during the course of a court-ordered examination . . . shall be admissible against the defendant on the issues raised by a plea of not guilty*, if the defendant is put to trial on those issues, except to rebut evidence of his mental condition introduced by the defendant to show incapacity to form a specific intent; and, in such case, such evidence may be considered by the trier of fact only as bearing upon the question of capacity to form a specific intent and the jury, at the request of either party shall be so instructed. *If the defendant testifies in his own behalf upon the trial of the issues raised by the plea of not guilty, the provisions of this section shall not bar any evidence used to impeach or rebut the defendant's testimony.*

*Pearson*, 546 P.2d at 1266 (quoting Colo. Sess. Laws 1972, ch. 44, 39–8–107(1) at 228) (ellipses in original) (emphases added).

**7.** The majority's attempt to analogize this dissent's analysis of HRS § 704–416 to the HRE is simply wrong. *See* majority opinion at 215, 172 P.3d at 527. The majority contends that if the courts were to follow the analytical path the dissent applies to HRS § 704–416, non-hearsay statements would be *per se* inadmissible under HRE Rule 802 inasmuch as that rule only applies to the exceptions which make otherwise inadmissible hearsay admissible. *Id.* Obviously, non-hearsay statements may be admissible under other provisions of the HRE, *e.g.*, HRE Rule 402 (2007), which provides in part, that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the State of Hawai'i, by statute, by these rules, or by other rules adopted by the supreme court[,]" although they might not be admissible under HRE Rule 802.

More to the point, the term "statement" in HRS § 704–416 is not used in an evidentiary context. Hence, the majority's recasting of the term is incorrect. The effect of HRS § 704–416, viewed with other provisions, *see* discussion *infra,* is to exclude matters of the examination not bearing on the physical and mental condition of the defendant. Accordingly, the majority overstates the implicit scope of the exclusion under HRS chapter 704.

the examination. To counter the advent of impeachment at trial a competent defense would have no choice but to assert in the examination itself its legal theory and its rebuttal to what it believed Respondent's inquiries would be at trial.[8] If, as in this case, the examiners can be called upon to testify as to what the defendant did not say, the defendant and examiner would be cast in adversarial roles during the examination.

Legal posturing, guarded and qualified responses, or explicit advocacy will extend the adversarial process into the examination process itself, destroying its purpose of obtaining "effective psychiatric and other medical diagnosis[.]" *Id.* (brackets omitted). This does not even consider the burdens placed on defendants whose physical or mental conditions render them incapable of or poorly equipped in performing the task of conveying in the examination a legal defense and rebuttal or the fairness of such a process as it subsequently develops at trial. It cannot be beneficial to society if a defendant who suffers from a mental disease, disorder, or defect is denied treatment because the defendant's failure to relate to the examiners additional factors that would support the insanity defense later casts doubt on the veracity of the insanity defense at trial. *See Castro*, 93 Hawai'i at 463, 5 P.3d at 453 (Acoba, J., concurring); Commentary on HRS § 704–400 (1993) (stating that "it has become common to qualify an acquittal based on the defendant's mental irresponsibility and to provide for commitment of the defendant thus acquitted to an appropriate medi-

cal institution" (internal quotation marks omitted)).

## VI.

Additionally, admitting evidence of what was not said to impeach the defendant substantially risks revealing information concerning the examination beyond that allowed under the express language of HRS § 704–416.[9] It is conceivable that to rebut impeaching evidence, the defense will be placed in the position of disclosing statements made to the examiners that do not relate to a mental or physical condition.

For example, after the court gave an instruction allowing impeachment, Respondent elicited testimony of whether Petitioner discussed with the examiners his belief in aliens. Petitioner stated that he could not recall what he had told Doctor Wade, that he did not think he used the term aliens when talking with Doctor Gitter, and that none of the doctors ever gave him a chance to discuss his readings about philosophies and religions regarding the individuals that were out to get him.

> Q [Respondent]. [Petitioner], isn't it true that you did not tell Doctor Wade anything about your views that there were aliens amongst us?
>
> A [Petitioner]. *I can't completely recall what I told Doctor Wade.*
>
> Q. Isn't it true that you never told that to Doctor Gitter?
>
>> ... *But there's no evidence he told anyone about this—any of these doctors about this.*
>> Why? He clearly understood what his purpose of going to that interview was. He understood it was for the purpose of understanding what was going on as to his state of mind at the time of the incident. But, he never tells them any of this?
>> *Why? Because, ladies and gentlemen, this was not what was going on in [Petitioner's] head.* ...
>
> (Emphases added.) (Some ellipses points in original and some added.)

---

**8.** Petitioner points out that in final argument Respondent argued that Petitioner failed to relate his views about "aliens" to the examiners because that "was not what was going on in [Petitioner's] head."

> ... [Respondent] argued that the additional details in [Petitioner's] trial testimony which had not been previously disclosed to the three-panel were fabricated:
> [RESPONDENT]: ... You know, Dr. Gitter told you, ladies and gentlemen, that when he interviewed [Petitioner], he saw no signs that [Petitioner] was fabricating what he was telling Dr. Gitter. *But, he never told Dr. Gitter a number of the things that he testified to during the trial. He never talked about these alien—I mean, these aliens from Mars in human form. He never talked about these earth histories.*

**9.** Of course, with respect to statements, "[t]he ban on usage as to other issues extends only to use against the defendant; if the defense wishes to bring out such *statements* it may do so." Comment on MPC § 4.09 at 268–69 (1985) (emphasis added).

A. *I don't think I ever used the term "aliens."*

Q. Isn't it true you never expressed your obsessions in reading about these philosophies and religions dealing with individuals out to get you?

A. *They never gave me a chance.*

(Emphases added.) Dr. Gitter, who Respondent called as a rebuttal witness, testified on direct examination that in his examination of Petitioner, he was not aware that Petitioner "express[ed] any strong interest in literature" describing "topics" of "humanoids." Respondent next called Dr. Wade, who related that in the examination Petitioner "talked about having consulted with his attorney about his mental state at the time of the offense and whether he would have a defense related to his mental state." Thus, in inquiring into what Petitioner did *not* say, Respondent exposed questions that were asked and matters that were covered during the examination that were not subject to disclosure under HRS § 704–416.[10]

## VII.

The use of Petitioner's "non-statement" for impeachment is particularly inappropriate here inasmuch as Petitioner's statements do not appear to be truly contradictory. Two of the examiners testified that Petitioner did express that he felt persecuted and that people were out to get him. On direct examination, Doctor Stojanovich testified that Petitioner "seemed to be under the belief that everybody was against him. He was under the belief that many people were there against him and that nobody had tried to help him." Similarly, Doctor Gitter testified on direct examination that at his interview with Petitioner, "he was still mildly delusional, he mentioned that he had been followed.... It was kind of a *paranoid delusion of being persecuted.*" (Emphasis added.) These statements are

not necessarily inconsistent with a belief in aliens inasmuch as the examiners called to rebut Petitioner's statement that he was influenced by delusions of aliens did not probe further to discern exactly who or what Petitioner believed was threatening him.

On cross-examination, Petitioner asked Doctor Gitter, "And in fact [your examination] never went deep enough to ask [Petitioner] whether those people might be alien or human-appearing but not really human?" to which Doctor Gitter responded, "I never asked him that question, no." Also on cross-examination, Doctor Wade answered affirmatively when asked if "[Petitioner] might have kept talking quite a bit longer" if Doctor Wade "had simply stood back and listened[.]"

We are not faced with a case in which a defendant asserting an insanity defense testified that he told the examiners, "I believed aliens were chasing me," only to be confronted with directly contradictory statements, such as evidence that he answered in the negative when asked by an examiner whether he had any delusions of aliens, extraterrestrials, or other-worldly beings. The HRS § 704–404 examination process cannot be equated with a prior trial, *see Asato v. Furtado,* 52 Haw. 284, 474 P.2d 288 (1970), cited by the majority; a deposition, *see Jackson v. Seib,* 372 Ill.App.3d 1061, 310 Ill.Dec. 502, 866 N.E.2d 663, 673 (2007) (holding that plaintiff was properly impeached by use of prior inconsistent statements made during a deposition); or a criminal investigation, *see Mai v. State,* 189 S.W.3d 316, 322 (Tex.App. 2006) (holding that witness was properly impeached by use of prior inconsistent statements made during a criminal investigation). Those situations are unlike mental examinations ordered under HRS chapter 704 that are intended to result in an expert opinion

---

10. Allowing such impeachment may have other unwarranted consequences, such as happened in this case, in which the defendant is placed in the dilemma of choosing between rebutting the attack on his credibility and waiving important rights, such as the attorney-client privilege. Other encumbering collateral effects may be the calling of new surrebuttal witnesses by the defendant and the fashioning of additional instructions

by the trial court. However, in this regard, it must be recognized that, in this setting, "[e]ven if a jury is carefully instructed to consider the defendant's statements only in respect to his mental condition, it is difficult for it not to be influenced in its judgment on other questions to which the statements are obviously relevant." Comment to MPC § 4.09 at 269 (1985) (footnote omitted).

regarding a defendant's cognitive and volitional capacities.

As to this point, the majority misapplies *Asato* for the proposition that plaintiffs (or, by analogy, the prosecution) should be allowed to impeach defendants' credibility through the use of prior inconsistent statements where the purported inconsistency is the defendant's omission of "important and material" facts. *See* majority opinion at 218, 172 P.3d at 530. In *Asato*, the discrepancy could be fairly pointed out and used to impeach the defendant's credibility.

*Asato* was a personal injury case arising out of an automobile accident. *Asato*, 52 Haw. at 286, 474 P.2d at 291. During the civil trial, the defendant testified that "he had been blinded by lights coming from the direction of the medial strip, and that before he could do anything, he hit something, which turned out to be plaintiffs' vehicle." *Id.* In a previous criminal trial arising out of the same accident, defendant had testified that "just before the impact" "he heard a crash, then he was blinded by bright lights coming from the direction of the medial strip, and then he hit something." *Id.* at 287, 474 P.2d at 292.

Plaintiffs sought to introduce defendant's testimony from the criminal trial as a prior inconsistent statement in order to impeach the defendant's credibility. *Id.* This court noted that whether a prior statement was inconsistent

> depends upon the circumstances under which the prior statement was made.... *But where the prior circumstances were such that the speaker could have been expected to state the omitted fact ... because he was purporting to render a full and complete account of the transaction or occurrence, and the omitted fact was an important and material one, so that it would have been natural to state it, the omission gives rise to a justifiable inference that the omitted fact was omitted because it did not exist.*

*Id.* at 288, 474 P.2d at 292 (citations omitted) (emphasis added). This court held that the defendant's testimony about hearing a crash should have been admitted as a prior consistent statement because (1) *defendant took the stand to testify on his own behalf in two trials* regarding the same incident, (2) the sequence of events was covered "more than once" *in the previous trial,* (3) defendant purported to give a "full and complete account" of the events, and (4) the fact was important and material to the defense because the existence of another crash might have significant influence on the jury's determination of whether defendant had been negligent. *Id.* at 288–89, 474 P.2d at 292–93.

In contrast, the circumstances surrounding Petitioner's non-statements do not give rise to the same inference of inconsistency. First, during the examinations, Petitioner was not advocating his defense and was not represented by counsel. Second, Petitioner did not claim to have given a "full and complete account" of his mental state inasmuch as the course of the examinations was directed by the examiners. And thus, third, the omission would not "give rise to a justifiable inference" that the fact was omitted because it did not exist. *Id.* at 288, 474 P.2d at 292. To allow Respondent to attack Petitioner's affirmative defense using such an ambiguous "contradiction" is not fair impeachment.

Additionally, as to this point, the majority's conclusion that "unlike the introduction of a prior inconsistent statement, the admission of a non-statement in the present matter does not import with it the defendant's actual statements into evidence[,]" majority opinion at 215–16, 172 P.3d at 527–28, is simply contrary to the manner in which the statement was treated by the court. Respondent's cross-examination of Petitioner was intended to show that his testimony was inconsistent with his prior statements to the examiners. Petitioner's counsel's elicitation on re-cross examination that Petitioner had previously told her that he believed aliens or humanoids were chasing him on the day of the incident was allowed under HRE Rule 613, which governs the admissibility of prior consistent statements to rehabilitate a witness whose credibility has been attacked by the use of a *prior inconsistent statement.*

Notably, the two examiners who diagnosed Petitioner with a mental illness did not think

that Petitioner was malingering [11] or feigning his symptoms. Doctor Stojanovich testified on direct examination that "it [would] be difficult and *unfair* to say that he was not impaired at all." (Emphasis added.) He went on to explain that in arriving at his diagnosis that Petitioner suffered from a brief psychotic episode, he had to

> come to a certain level of understanding, *certain level of myself being certain as to whether or not he did indeed or not suffer with the substantial impairment of* ... his ability to comprehend what he was doing and his ability to do things only that the law requires and nothing else.

> And so ... when I said more likely than not, that means that in my opinion, after considering all the things that we have to consider, *in my opinion [Petitioner] was more likely than not having that substantial impairment that the law requires for this kind of examination.*

(Emphases and ellipses added.) More directly, Doctor Gitter testified on cross examination that "from [his] testing and interview with" Petitioner, he did *not "find any evidence of feigning or exaggeration on [Petitioner's] part*[.]" (Emphasis added.) Dr. Wade did not indicate that Petitioner was untruthful during the examination.

## VIII.

Furthermore, as recounted *supra,* the purpose of "safeguard[ing] the defendant's rights" by precluding "the defendant's statements" from being "put in evidence on any other issue, e.g., whether the defendant in fact engaged in the proscribed conduct, in penal proceedings[,]" Commentary on HRS § 704–416 (internal quotation marks and footnote omitted), would be usurped by

allowing evidence of guilt to be drawn inferentially from what was *not* said in an examination. The compulsory nature of the examination and its intrusion into a defendant's right against self incrimination is recognized by the provision that "[a] statement made by a person subjected to examination ... shall not be admissible in evidence ... on any issue other than that of the person's physical or mental condition, but it shall be admissible upon that issue[.]" HRS § 704–416. As a further safeguard, a statement that otherwise would relate to a person's physical or mental condition is still excluded if "such statement constitutes an admission of guilt[.]" *Id.*

According to the Code, these strictures on disclosure of examination matters are "inten[ded] ... to meet two problems: (1) the inability of a jury to divorce a statement containing an admission of guilt from the determination of all issues, and (2) an objection to the examination of the defendant on the basis of defendant's privilege against self-incrimination." Commentary on HRS § 704–416 (footnote omitted). Thus, the restriction on the scope of admissibility under HRS § 704–416 is necessary because "the purpose of an interview to probe sanity at the time of the commission of the charged offense is to obtain from the accused information bearing directly on his [or her] guilt ... [and in such an examination] there is a greater likelihood of soliciting statements that breach a defendant's Fifth Amendment rights." *United States v. Leonard,* 609 F.2d 1163, 1167 (5th Cir.1980) (internal citation omitted).

Hence, restrictions similar to that regarding statements that are *made* in any examination would also pertain to admissions of

---

11. Malingering is defined as "feign[ing] illness or disability, [especially] in an attempt to avoid an obligation or to continue receiving disability benefits." *Black's Law Dictionary* 978 (8th ed.). A similar definition used by an expert witness was recently quoted by the Sixth Circuit Court of Appeals: " '[A]ttempting to feign an illness,' which 'is often done for what we might call the secondary gain; whatever might be derived from feigning an illness.' " *Haliym v. Mitchell,* 492 F.3d 680, 708 (6th Cir.2007). Signs of malingering include (1) tailoring responses to each ques-

tioner, (2) providing "ridiculous" answers to simple questions that are answered correctly even by people who are severely impaired, (3) cognitive abilities that are inconsistent with self-reported symptoms, (4) "mixing" symptoms of different disorders, (5) reporting inconsistent symptoms across multiple interviews with the same examiner, and (6) "inexplicable" inconsistencies in the defendant's ability to understand the charges and proceedings he faced in successive interviews with the same examiner. *Wallace v. United States,* 936 A.2d 757, 758, 2007 WL 2669564 at *5–*6 (D.C.2007).

guilt inferred from what was *not* said in an examination. While a failure to make a specific statement would not strictly fall within the protection against self incrimination, impeachment by omission places the defendant in a position of jeopardy he would not be in otherwise but for the compelled examination.[12] To permit such inferences of guilt to be made would be inconsistent with the limited use of evidentiary matter now allowed under HRS § 704–416 in connection with the examination.

## IX.

Also, as noted *infra*, inasmuch as the examiners control the mode and duration of the examination, placing the burden on a defendant to affirmatively assert his legal theory or to penalize him for not asserting his legal theory in the examination is not only counterproductive, but unfairly prejudicial. Petitioner testified that his interaction with all of the examiners was extremely brief. According to Petitioner, he had only a "real brief session" with Dr. Wade, he did not discuss much about "the incident itself" with Doctor Glitter, and although Dr. Stojanovich allowed him to speak freely, he would direct Petitioner and cut off Petitioner where the doctor believed necessary.

To reiterate, examinations performed, as in the instant case, may employ "any meth-od" that "is accepted by the professions of medicine or psychology for the examination of those alleged to be affected by a physical or mental disease, disorder, or defect[.]" HRS § 704–404(3). Thus, it is for the professional examiners to determine how a particular evaluation will proceed. Petitioner had no control over the questions the examiners asked him or the scope of the oral examination.

Furthermore, it is not within the purview of the courts to dictate which matters, *e.g.*, the theory of the defense, are pertinent to a mental evaluation or to interfere with the examiners' methodology in conducting the evaluation. *See id.* (explaining that examiners may choose any method for evaluations accepted by the medical or psychology professions). Therefore, permitting impeachment of the defendant as to what he did not say defeats the purpose of having an independent evaluation based on such professional standards.[13]

## X.

Not only was the Respondent's inquiry into Petitioner's silence improper given the limiting language and underlying purposes of HRS § 704–416 and related provisions, it was outside the scope of proper cross-examination. In its Answering Brief and at oral argument, Respondent argued that Petition-

---

**12.** The Commentary to MPC § 4.09 states that "it is unfair to tax the defendant generally with statements made during the state-authorized process at which he is encouraged to speak freely." Comment on MPC § 4.09 at 268 (1985) (footnote omitted).

**13.** The majority implies that this dissent's analysis of HRS § 704–416 "stretche[s it] beyond its terms to exclude non-statements, and, accordingly" misinterprets its "plain language." Majority opinion at 215, 172 P.3d at 527. To the contrary, this dissent's approach notes that the statute, as written, does not encompass the situation presented, and therefore answers the questions raised in the Petition by considering the textual context and the policies of the relevant provisions of HRS chapter 704 together.

On the other hand, although the majority also recites the well-established tenet requiring statutes to be construed "in the context of the entire statute ... and in a manner consistent with [their] purpose", *id.* at 224, 172 P.3d at 536 (quoting *State v. Haugen*, 104 Hawai'i, 71, 76, 85

P.3d 178, 183 (2004) (citation, internal quotation marks, and brackets omitted)), it does not actually employ it, and therefore reaches a flawed conclusion. Specifically, after reciting the aforementioned principle, the majority goes on to say merely that

HRS [chapter] 704 was principally designed to relieve criminally irresponsible defendants of penal liability, *see* HRS § 704–402(1) (1993) ("Physical or mental disease, disorder, or defect excluding responsibility is an affirmative defense."), and excluding non-statements from the purview of HRS § 704–416 furthers that end. In short, the statute's purposes are not imperiled by interpreting its terms in a straightforward fashion.

*Id.* at 216–17, 172 P.3d at 528–29.

Such cursory treatment of the related statutory sections and the underlying purpose of the statute is insufficient to resolve the issue at hand. Hence, the majority's bare assertions—without any explanation—that the majority's interpretation of the statute does "not imperil[ ]" the statute's purposes, is wholly unsupported.

er opened the door to the attack on his credibility by putting his mental state at issue. In essence, Respondent contended that by taking the stand and testifying that he was driven by his "thoughts" about aliens or humanoids at the time of the incident, Petitioner made himself vulnerable to questioning about the truthfulness of that testimony.[14]

Like other witnesses, "[a] defendant who elects to testify in his own defense is subject to cross-examination as to any matter pertinent to, or having a logical connection with the specific offense for which he is being tried." *State v. Pokini,* 57 Haw. 17, 22, 548 P.2d 1397, 1400 (1976) (citations omitted). The "pertinent matters" on which a defendant may be cross-examined include "collateral matters bearing upon his credibility...." *Id.* But the scope of the cross-examination of the defendant, while committed to the discretion of the trial court, is not unlimited.

> The subject matter of the inquiry *must have some rational bearing upon the defendant's capacity for truth and veracity.* And where the testimony sought to be elicited *is of minimal value on the issue of*

credibility and comes into direct conflict with the defendant's right to a fair trial, the right of cross-examination into those areas must yield ....

*Id.* at 22–23, 548 P.2d at 1400–1401 (emphases added) (internal citations omitted).[15] This is just such a case. The testimony elicited from Petitioner on cross-examination was of minimal value in assessing his credibility and conflicted with his right to a fair trial.

## XI.

Under the *Pokini* standard regarding impeachment of a defendant, Respondent's elicitation of testimony regarding Petitioner's failure to mention aliens, humanoids, or alternative earth theories on its direct examination of Doctors Gitter and Wade should have been barred. Respondent's direct examination of Doctor Gitter included the following:

> Q. [Respondent]: ... [D]uring the course of your interview of [Petitioner], *did he ever speak about ... humanoids or ... other beings who came in human form who were amongst us?*
>
> A. [Dr. Gitter]: *No.*

14. Generally, "the scope of cross-examination is ... within the sound discretion of the trial court." *State v. Corella,* 79 Hawai'i 255, 260, 900 P.2d 1322, 1327 (App.1995) (citing *State v. Silva,* 67 Haw. 581, 587, 698 P.2d 293, 296 (1985); *Pokini,* 57 Haw. at 22, 548 P.2d at 1400). "An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant." *State v. Jackson,* 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996) (internal quotation marks and citations omitted). In order to aid the finder of fact in assessing the veracity of testimony, a witness "may be cross-examined on matters bearing upon the witness's credibility, biases, prejudices, or ulterior motives." *Corella,* 79 Hawai'i at 260, 900 P.2d at 1327 (internal citations omitted) (citations omitted).

15. The majority states that "[t]he *Pokini* rule is implicit in HRE Rule 403, pursuant to which a trial court may preclude cross-examination if the probative value of the impeachment evidence is substantially outweighed by the danger of unfair prejudice to the defendant's right to a fair trial." Majority opinion at 217, 172 P.3d at 529. However, *Pokini* sets a different standard for precluding cross-examination of a defendant, given the importance of the defendant's constitutional

right to a fair trial. Hence, *Pokini,* 57 Haw. at 22–23, 548 P.2d at 1400–1401, does not require that the value of the testimony to be elicited from defendant be "substantially outweighed" by the threat to the defendant's right to a fair trial, but only that the testimony would be "in direct conflict" with that right. Moreover, the analogy to HRE Rule 403 is inappropriate inasmuch as that Rule applies to all evidence whereas the standard under *Pokini* specifically addresses cross-examination of a defendant.

Even assuming, *arguendo,* that HRE Rule 403 could apply to this case, the majority's analysis on this point is wrong. The majority concludes "that [Petitioner's] failure to mention his concerns regarding aliens was clearly relevant to the question whether he was being truthful when he testified at trial that he had those concerns at the time of the incident." Majority opinion at 218, 172 P.3d at 530. This analysis fails to consider the crucial factor of admissibility under HRE Rule 403: whether the relevant evidence is "substantially outweighed by the danger of unfair prejudice...." Applying this factor to Respondent's use of Petitioner's non-statements, the probative value of the non-statements was "substantially outweighed by the danger of unfair prejudice" as set forth in the discussion applying *Pokini* to this case, *see infra.*

Q. *Did he ever express any strong interest in literature describing those types of topics.*

A. Not that I'm aware of.

. . . .

Q. If [Petitioner] had been involved in that kind of thinking along the lines of these other beings in humanoid form who were going to take over the world and perhaps place him in danger, *would you have expected that some information regarding that would have been provided to you during your interview of [Petitioner]?*

A. *I suppose so, but that wasn't provided to me.*

(Emphases added). At the end of Doctor Gitter's direct examination, however, Respondent elicited Doctor Gitter's opinion that during his interview, Doctor Gitter did not believe that Petitioner was feigning or exaggerating his symptoms. Immediately thereafter, Respondent questioned Doctor Gitter again about the information Petitioner offered during the examination:

Q. [Respondent]: But at the same time, he never mentioned anything about aliens, for instance?

A. [Doctor Gitter]: *Not to me.*

Q. And he never mentioned anything about some philosophy along the lines of the aliens in human form taking over the world?

A. *He did not mention it to me nor did I see it mentioned to anybody in the jail.*

(Emphases added). Of course, Dr. Gitter's testimony that Petitioner did not mention this to Dr. Gitter or other persons in jail would assume that there was some obligation on Petitioner's part to volunteer such information—an assumption, however, that is not supported by the examination procedure or anything in the record. *See State v. McCrory,* 104 Hawai'i 203, 208, 87 P.3d 275, 280 (2004) ("[A d]efendant has no affirmative duty to proclaim his innocence, much less to do so to his cellmate." (Citation omitted.)).

The course of Doctor Wade's direct testimony is similar. Reiterating Doctor Wade's observation that Petitioner was focused on disappointments arising out of family and employment relationships, Respondent then elicited testimony from Doctor Wade that the issue of aliens and alternative earth histories was absent from Petitioner's examination with Doctor Wade.

Q. [Respondent]: ... [A]t any point during the course of your interview with the [Petitioner] or from any of the records that you were able to review, did [Petitioner] talk about anything regarding the end of the world?

A. [Doctor Wade]: *No.*

Q. Did he talk about there might be or suggest that there were, aliens in humanoid form that intended to take over the world?

A. *No.*

. . . .

Q. Did he express to you that he was involved in reading about these types of things, including other-Earth histories, perhaps conspiracy theories, anything along those lines?

A. *No.*

Q. Would you have, *if those were prevailing thoughts on the part of [Petitioner] at the time of your interview with him, would you have expected those types of things to come forward?*

A. *Yes.*

Q. Can you explain why?

A. *Well, when I asked him about what the purpose was of my interview, he talked about having consulted with his attorney about his mental state at the time of the offense and whether he would have a defense related to his mental state.*

(Emphases added). The fact that Petitioner talked about "whether he would have a defense related to his mental state" does not establish that Petitioner was, at that point, legally expected to discuss the theory of that defense. Significantly, despite Dr. Wade's "expectation" of what Petitioner would have said, "if those were prevailing thoughts ... at the time of [the] interview," *Dr. Wade apparently did not conduct any inquiry about what the defense theory that "related to his mental state" was, thus indicating that this area was not important to his evaluation.*

## XII.

The majority concludes that allowing evidence of what a defendant failed to say does not undermine the purpose and policy of HRS chapter 704. *See* majority opinion at 217, 172 P.3d at 529 ("the statute's purposes are not imperiled by interpreting" HRS § 704–416 "in a straightforward fashion"). The majority announces that its rule "would ... likely serve to encourage the defendant to be more forthcoming with the examiners, which is consistent with HRS [chapter] 704's general objective of aiding examiners in gaining access to information relating to the defendant's mental and physical condition at the time of the offense...." Majority opinion at 216, 172 P.3d at 528. To the contrary, cross-examination on what Petitioner did not say should have been excluded in view of the objectives of the examination procedure and under *Pokini.*

### A.

First, as to a "rational bearing upon the defendant's capacity for truth and veracity," *Pokini,* 57 Haw. at 22, 548 P.2d at 1400 (citation omitted), unmade statements in the context of the three-member examination cannot automatically and categorically be deemed illustrative of defendant's capacity for truthfulness. An assumption that the defendant is lying by omission in such a situation can be dangerously inaccurate and is inherently unfair in the context of the examination procedure.

Respondent's questions on cross-examination and the court's instructions wrongly presumed, as a matter of law, that the defendant was expected to set forth his legal defense in the examination. The failure, however, to make such a statement in the examination setting is " 'ambiguous, and thus of dubious probative value,' for many other 'explanations for the silence' exist that are not indicative of guilt." *McCrory,* 104 Hawai'i at 207, 87 P.3d at 279 (quoting *Doyle v. Ohio,* 426 U.S. 610, 619 n. 8, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (brackets omitted)).[16]

As the examination process is presently structured, a defendant is not expected to create a veritable "checklist" of topics to be covered with each examiner. The examiners, *not the defendant,* control the method and scope of questioning in the examination as it must be.[17] It is established that "there are 'situations in which an accused is clearly under no duty to speak' and where there are various reasons, 'regardless of guilt or innocence,' for maintaining one's silence." *McCrory,* 104 Hawai'i at 206–07, 87 P.3d at 278–79 (quoting *Fowle,* 410 F.2d at 50 (brackets and footnote omitted)). Accordingly, "[i]n such circumstances, since innocent and guilty alike may choose to stand mute, ... proof of such former silence should be excluded under universally recognized principles of evidence." *Id.* at 207, 87 P.3d at 279 (quoting *Fowle,* 410 F.2d at 50) (ellipses in original).

**16.** There may be instances where the context may call for a response, but such an instance should take place within an examination, and generally should not involve matters regarding the examination. *See McCrory,* 104 Hawai'i at 207 n. 4, 87 P.3d at 279 n. 4 (silence may be significant if "it persists in the face of accusation" (quoting *Fowle v. United States,* 410 F.2d 48, 50 (9th Cir.1969))).

**17.** The majority states that the examiner's control of the examination is "relevant to the weight to be accorded the evidence of the omissions and not to it's *admissibility*[.]" Majority opinion at 218, 172 P.3d at 530 (emphasis in original). According to the majority, once the jury learned of Petitioner's non-statements and heard his explanation, "it was for the jury to decide" whether it believed that Petitioner did not mention aliens because he did not have the opportunity or be-

cause he did not actually believe they were chasing him. *Id.*

This position disregards the insidious danger presented by the admission of so called non-statements to impeach a defendant. The impeachment did not merely attack Petitioner's credibility; it conflicted with his right to a fair trial. The fact that Petitioner was not in control of the scope or flow of the mental examination which was the basis for the impeachment highlights the unfairness of admitting evidence of what he did not say. Thus, under the approach employed in *Pokini,* the nature of the examination would go to *admissibility* and not merely *weight* of a "non-statement," as the majority would have it. This is because the nature of the mental examination is relevant to whether Respondent's cross-examination of Petitioner concerning the examination impermissibly infringed on his right to a *fair* trial.

Permitting impeachment by what was *not* said obfuscates the fact that Petitioner was not under any obligation to unilaterally volunteer information. *See id.* at 206–07, 87 P.3d at 278–79 (citation omitted). Because of the structure of the examination process, silence cannot reasonably be inferred as indicative of untruthfulness or guilt. Hence, in this setting, that Petitioner did not explain the defense's legal theory in the examination can have little rational bearing upon his credibility.

Second, as a collateral matter noted before, assuming as the majority does and the court did, that a defendant must relate the basis for his legal defense in the examination injects the courts into an area committed to other professional expertise. The clear implication of the requirement that the court appoint licensed professionals to the panel and that each panel member may employ "any method" that "is accepted by the professions of medicine or psychology[,]" HRS § 704-404(3), is that the determination of defendant's purported mental or physical condition is initially a question of the panel's expertise.

Authorizing the prosecution to inquire into what was not asked or discussed in these examinations undermines the statutory discretion vested in an examiner to decide what information is relevant in making his or her own diagnosis. The impropriety of such an inquiry is further emphasized in this case by the fact that although Respondent tried to persuade the jury that Petitioner was feigning his alleged mental illness based on what he did not tell the examiners, two examiners opined that Petitioner was not malingering in the examination and suffered some degree of impairment. Specifically, Petitioner was diagnosed variously as suffering from a brief psychotic episode, a major depressive disorder, and methamphetamine dependence. Indeed, none of the examiners indicated they believed Petitioner was being untruthful.

### B.

Hence, any failure by Petitioner to expound on a subject not inquired into by the examiners had "minimal [probative] value," *Pokini,* 57 Haw. at 23, 548 P.2d at 1400, on the issue of credibility. On the other hand, Respondent's inquiry into what was not said "direct[ly] conflict[s] with [Petitioner's] right to a fair trial." *Id.* As embodied in the procedures set forth in HRS chapter 704, the court-ordered examination was not intended to be a proving ground for a defendant's legal theory. Allowing the prosecution to mine the examination for impeachment purposes destroys the "confidence" sought to be engendered by the statutory procedure and thought necessary for "effective psychiatric ... diagnosis[.]" Commentary on HRS § 704-416.

The majority's approach casts the examination in a legalistic framework, raising the substantial risk that what is ambiguous, unintended, or purely innocent in the examination may be taken as proof of guilt or dishonesty at trial. As set forth in the discussion *supra,* the impeachment approach employed in this case would not only directly conflict with, but abrogate, the underlying purposes of the examination procedure, converting it into part of the adversarial trial process. Under these circumstances "the right of cross-examination ... must yield[.]" *Pokini,* 57 Haw. at 23, 548 P.2d at 1400–01.

### C.

This is not to say that the defendant's credibility is entirely unassailable when the defendant takes the stand. It certainly would be within a trial court's discretion to allow questioning directly related to the defendant's capacity for truthfulness that was not related to statements made to the three-panel. For example, questioning the defendant about his employment and sources of income to impeach defendant's credibility may be within the trial court's discretion. *See id.* at 23, 548 P.2d at 1401 ("While we find that the trial court was somewhat overly permissive in the cross-examination of the defendant ..., we are satisfied that this, in and of itself, did not prejudice his cause.") The court might also act within its discretion by allowing cross-examination regarding prior convictions for crimes directly implicating truthfulness, such as perjury. *See* HRE Rule 609(a) (2007) ("[I]n a criminal case where the defendant takes the stand, the

defendant shall not be questioned or evidence introduced as to whether the defendant has been convicted of a crime [involving dishonesty] ... unless the defendant has ... introduced testimony for the purpose of establishing the defendant's credibility as a witness, in which case the defendant shall be treated as any other witness as provided in this rule."); *see also*, Commentary on HRE Rule 609 (quoting *Asato*, 52 Haw. at 292–93, 474 P.2d at 294–95) ("A perjury conviction, for example, would carry considerable probative value in a determination or whether a witness is likely to falsify under oath.").

### XIII.

In contrast to the outcome in *Pokini*, the specific cross-examination of Petitioner in this case did "prejudice his cause" to such an extent that the judgment of the court must be vacated. The presentation of Petitioner's insanity defense was unfairly prejudiced because the court disregarded the limitations inherent in the examination process to Petitioner's "substantial detriment." *See Jackson*, 81 Hawai'i at 47, 912 P.2d at 79 (setting forth abuse of discretion standard) (citations omitted). In sanctioning impeachment of Petitioner's testimony because of statements that were not made to the panel, the court disregarded both the provisions of HRS chapter 704 governing the use of information obtained during mental examinations of defendants and the purposes underlying the examination procedure. The statutory provisions and underlying policy clearly limited the inquiry made to members of the panel to an assessment of the defendant's physical or mental condition.

### XIV.

#### A.

Regarding the second question, in limiting use of Petitioner's testimony to impeachment purposes, the court did not alleviate the prejudicial impact of Respondent's questions. The instruction amplified the improper use of impeachment.[18] As Petitioner notes, "the jury is presumed to have followed these erro-

neous limiting instructions[.]" *See State v. Smith*, 91 Hawai'i 450, 461, 984 P.2d 1276, 1287 (App.1999) (recognizing that "it will be presumed that the jury adhered to the court's instructions") (internal quotation marks and citation omitted). Thus, the jury here is presumed to have considered Petitioner's silence for credibility purposes, when information about the examinations should only have been admitted for purposes of adjudicating Petitioner's mental state or condition on the date of the incident.

#### B.

Petitioner notes that "although [he] did object to the State's initial attempt to cross-examine Petitioner regarding his prior statements[,]" he did not "object to the erroneous limiting instructions" and thus, the issue is "raised as plain error" on appeal. The introduction of impeachment evidence, as set forth *supra*, constitutes plain error, and is noticeable by this court. *Domingo*, 69 Haw. at 71, 733 P.2d at 692 (citations omitted). In *Domingo*, a murder trial, this court held that HRS § 704–416 prohibits attacking a witness' credibility by using statements made during the course of a mental examination. *See id.* The defendant in that case relied upon the defenses of mental incapacity and self defense, and was subjected to a mental examination by a three-member panel. *Id.* at 69, 733 P.2d at 691. In support of his self-defense claim, defendant testified that the decedent cut him with a sharp object. *Id.* at 70, 733 P.2d at 692.

The prosecution discredited the defendant's self-defense argument with the testimony of one of the medical examiners. *Id.* The examiner testified that the defendant told him the cut was instead a result of being struck by the decedent with a chair. *Id.* Referring to HRS § 704–416, this court said, "[c]learly, Dr. Dave's testimony, with respect to what appellant told him as to how he received the cut on his hand, *was not adduced for the purpose of establishing his physical or mental condition, but was adduced for the purpose of attacking his credi-*

---

**18.** The court instructed the jury "to limit [its] consideration of the response ... to [its] determi-

nation on issues of credibility. [It was] not to consider the response for other matters...."

*bility ... and is forbidden by [HRS § 704–416]." Id.* at 71, 733 P.2d at 692 (emphasis added). Hence, this court remanded the case for new trial. *Id.*

In the instant case, the central issue was whether Petitioner was penally responsible for his actions on August 1, 2003. The only evidence on this point was the conflicting testimony of the panel and the testimony of Petitioner himself. Impeachment of Petitioner's direct testimony regarding his mental condition on the day of the incident raises "a reasonable possibility" that the improper examination by Respondent "may have contributed to" Petitioner's conviction. *See id.* (stating that the harmless error standard requires a determination "that there is no reasonable possibility" that the erroneously admitted evidence contributed to the jury's verdict).

Analogously, in *Domingo,* this court concluded that inclusion of testimony "for a statutorily prohibited purpose cannot be said to be harmless beyond a reasonable doubt...." *Id.* This court alternatively phrased the harmless error standard as requiring a determination "that there is no reasonable possibility" that the erroneously admitted evidence contributed to the jury's verdict. *Id.* Here, the error does not appear harmless beyond a reasonable doubt since the allowance of Respondent's questions violated the purposes of the examination process in HRS chapter 704, the questions were used to impeach Petitioner's credibility, and the questions did not enhance his insanity defense as was the case in *Samuel,* 74 Haw. 141, 838 P.2d 1374,[19] cited by the ICA.

## C.

Respondent does not argue that error, if any, in the impeachment procedure was harmless error. But because the court's limiting instruction was not objected to during the trial, it was raised as plain error, making "a reversal ... necessary only if the erroneously admitted evidence did not constitute harmless error or there was a reasonable possibility that the erroneous admission of evidence may have contributed to the defendant's conviction[.]" *Id.* at 151–52, 838 P.2d at 1380 (citing *Domingo,* 69 Haw. at 71, 733 P.2d at 692.)

As mentioned previously, the central issue in the instant case was Petitioner's mental state at the time of the incident. Petitioner asserted an insanity defense, claiming that he was not penally responsible for his actions on that date because of a mental illness or defect. Respondent's theory of the case proposed that Petitioner's cognition and volition were not substantially impaired at the time of the incident. Rather, Respondent posited to the jury that "on that day [Petitioner] snapped, but he snapped not because of any mental disorder but because of his [methamphetamine] use."

However, there was conflicting evidence regarding Petitioner's methamphetamine use. Jason Reed, who observed Petitioner during the incident, testified that, in his opinion, Petitioner was "high" at the time of the incident. Officers Werner and Forrester, who were involved in Petitioner's pursuit and arrest, both testified that they "checked off the categories 'mentally deranged' and 'sus-

19. In *Samuel,* 74 Haw. at 143, 149, 838 P.2d at 1376, 1379, the defendant was convicted of murder and challenged the admission of testimony by her examiners relating statements she made to the panel. The examiners, explaining the basis of their opinions, referenced statements made by the defendant during her evaluation, *id.* at 149, 838 P.2d at 1379, such as "[t]hen it all came to a head. She[, (the decedent),] didn't care about me anymore" and "I don't recall what I wanted to do, I just wanted the pain to stop." *Id.* at 150, 838 P.2d at 1379 (internal quotation marks omitted). This court held that Samuel's statements to the examiners were admissible under HRS § 700–416 to determine *"whether her mental condition negated criminal responsibility"* because they spoke to *"her state of mind prior to and after*

*the stabbing incident." Id.* at 151, 838 P.2d at 1379 (emphases added). Contrary to the case at bar, the statements admitted in *Samuel* "were not prejudicial[,]" *id.* at 152, 838 P.2d at 1380, inasmuch as they were not used to attack the defendant' credibility. Further, Samuel's counsel made no objection to the admission of the statements, *id.,* whereas in this case, counsel objected repeatedly to the evidence of the non-statement. Finally, *Samuel* is distinguishable to the extent that the "insanity defense ... was withdrawn ... in order to give [the defendant] a clear opportunity for a manslaughter verdict rather than an outright acquittal based on marginal evidence of legal insanity." *Id.* at 156, 838 P.2d at 1382.

pected drug use' " on their respective Honolulu Police Department "192E" incident forms. Officer Werner also testified that Petitioner admitted to smoking methamphetamine "a few hours before [the incident]."

On rebuttal, Dr. Gitter testified that Petitioner suffered from a depressive disorder and was under the influence of methamphetamine at the time of the incident. Based on the lack of any noted psychotic behaviors in the two-and-one-half months between the incident and Dr. Gitter's examination of Petitioner, "[Petitioner's] use of methamphetamine became a significant factor in Dr. Gitter's opinion as to why [Petitioner] exhibited psychotic conduct during the [incident.]" Dr. Wade also testified on rebuttal that Petitioner "did not suffer from a mental disease, disorder, or defect" but that Petitioner was "methamphetamine dependent."

In contrast, Dr. Stojanovich testified on direct examination that Petitioner's conduct "could have occurred 'without any substance abuse,' and other than [Petitioner's] report that he had used drugs two days before the [incident], [Dr. Stojanovich] saw no evidence that [Petitioner] was under the influence of drugs at the time of the [incident]." On cross-examination, Dr. Stojanovich expressly disagreed that Petitioner's "psychotic episode ... was a result of his methamphetamine use." Petitioner himself testified that although he used methamphetamine "a few days" prior to the incident, he used "neither ... methamphetamine nor alcohol on that day."

Faced with conflicting evidence, the jury had to weigh the credibility of each witness. If it found Respondent's witnesses more credible, and believed that Petitioner was under the influence of methamphetamine at the time of the incident, it would have to find that Petitioner was penally responsible for his actions. If, on the other hand, it found Petitioner's witnesses more credible, it could find that Petitioner had proven his insanity defense. It is manifest, then, that the "plain error" of permitting impeachment of Petitioner's testimony through the examination of Petitioner and Drs. Gitter and Wade was not harmless beyond a reasonable doubt. There is certainly a "reasonable possibility" that the improper impeachment of Petitioner's testimony contributed to his conviction. *Domingo*, 69 Haw. at 71, 733 P.2d at 692.

### XV.

For the reasons stated above, I would hold that admission of evidence of what Petitioner did not tell the examiners for the purpose of impeachment was harmful error, and, thus, Petitioner is entitled to a new trial.[20]

---

**20.** Other arguments raised in Petitioner's petition, in sum, are resolved by, or need not be reached, as a result of the discussion *supra*.